## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JASON REZAIAN,

MARY REZAIAN,

    and

ALI REZAIAN

        Plaintiffs,

  v.

THE ISLAMIC REPUBLIC OF IRAN,
THE ISLAMIC REVOLUTIONARY
GUARD CORPS,
c/o Ministry of Foreign Affairs
Khomeni Avenue, United Nations Street
Tehran, Iran

        Defendants.

Civil Action No. 1:16-cv-1960

## COMPLAINT

1.    Plaintiffs Jason Rezaian, Mary Rezaian, and Ali Rezaian (collectively, the "Rezaians" or

"Rezaian family" or "Plaintiffs") bring suit against Defendants the Islamic Republic of

Iran and the Islamic Revolutionary Guard Corps ("IRGC") (collectively, "Iran" or

"Iranian Government" or "Defendants") under the Foreign Sovereign Immunities Act, 28

U.S.C. §§ 1602 *et seq.* ("FSIA"), for severe personal injuries and other irreparable harm

suffered as a result of Defendants' unlawful acts of terrorism, torture, hostage taking, and

other torts.

2.      The Iranian Government targeted and arrested Jason Rezaian, subjected him to torture and other cruel treatment, and held him hostage for the unlawful purpose of extorting concessions from the U.S. Government and others.  At the time of his arrest in July 2014, Jason—a dual national of the United States and Iran—was the Tehran correspondent for *The Washington Post* (or "the *Post*").  He was a fully accredited journalist working in accordance with Iranian law:  he was properly registered with the appropriate Iranian authorities, complied with all applicable Iranian laws and regulations, and dutifully adhered to the requirements of the Iranian agency responsible for media control and oversight.  Iran had no legal basis to arrest or imprison Jason Rezaian.

3.      Plaintiffs' nightmare began on July 22, 2014, when armed agents of Defendant IRGC forcefully entered the home of Jason and his wife, Yeganeh Salehi, and held them at gunpoint.  IRGC agents proceeded to ransack their apartment, take them hostage, and transport them in the dead of night to Evin Prison on the outskirts of Tehran—a notorious facility where hostages and other political prisoners are kept in deplorable conditions, brutally interrogated, and subjected to physical distress, psychological abuse, and in the words of the U.S. Department of State, "cruel and prolonged torture."[1]

4.      For 544 terrifying days—from July 22, 2014, to January 16, 2016—IRGC and other Iranian agents tortured and tormented Jason using a cruel combination of harsh physical mistreatment and extreme psychological abuse.  They held him in prolonged solitary confinement, deprived him of sleep, aggressively and relentlessly interrogated him, denied him basic medical treatment for serious and painful illnesses and infections, and

---

[1]  U.S. Dep't of State, *2015 Human Rights Reports: Iran* (Apr. 13, 2016), http://www.state.gov/j/drl/rls/hrrpt/2015/nea/252923.htm.

threatened him with dismemberment, execution, and other forms of cruel and unusual physical torture.  They also threatened to maim and kill his wife Yeganeh and other family members.  For most of the 544 days, Jason suffered from various illnesses, infections, and other health complications, including rapid weight loss, acute respiratory complications, sores and infections, severe anxiety, paranoia, and major depression, all without adequate medical care or treatment.  Iran severely and intentionally exacerbated Jason's illnesses, infections, and other health problems by subjecting him to prolonged physical mistreatment and psychological torture.

5.      From July 22, 2014, to October 5, 2014, his wife Yeganeh Salehi also suffered a similar fate in Evin Prison.  The IRGC and Iranian agents tortured and tormented her for two and a half months, virtually all of it in solitary confinement.  During this time, they physically mistreated her, subjected her to extreme psychological abuse and duress, aggressively interrogated her for days and weeks on end, deprived her of sleep, and threatened to torture, dismember, and execute her.  They also threatened to—and led her to believe that they would—torture, dismember, and kill Jason and other family members.  As a result of such extreme mistreatment, Yeganeh suffered from severe anxiety, paranoia, and other physical and psychological problems, all of which has permanently affected her relationship with Jason and her family and friends.

6.      After Yeganeh was released on bail, on October 5, 2014, Defendants' agents continued to follow, surveil, harass, threaten, and intimidate her and her family.  They told her falsely that Jason had committed crimes against the Iranian state and made her believe that he would die in Evin Prison.  During Jason's incarceration, Yeganeh felt such terror, trauma, and desperation that she contemplated suicide, believing that ending her own life might

help obtain Jason's release and demonstrate to the world the tragic consequences of Iran's hostage taking, torture, and other crimes.

7.     In a futile effort to justify its crimes, Iran accused Jason of "spying" and other unspecified offenses against the Iranian regime.  But those were blatant lies, fabricated by Iran so it could put Jason on trial, convict him of espionage and other high crimes, and thereby increase what Iran perceived to be his "value" in any prisoner exchange or other trade with the United States or others.

8.     Iran made little effort to hide the fact that the criminal case against Jason was pure pretext for taking and keeping him as a hostage.  At the so-called "trial," Iran proffered no real evidence or witnesses to support any of the charges against him.  The trial proceedings were a sham, with no due process of law.  Iran denied Jason his right to counsel of his choice, gave him and his assigned counsel no time to prepare a defense, barred him from presenting any witnesses or evidence, and failed to produce a single piece of real evidence against him.  During the erratic course of the proceedings, the court held sham hearings without any notice, often conspicuously coinciding with developments in the nuclear negotiations and related talks between the United States and Iran.  Although the trial was never completed, and Jason never had any real opportunity to present his case or challenge the case against him, the Iranian-government-controlled press eventually conveyed that Jason had been convicted of unspecified crimes and sentenced to an unspecified number of years in prison.  To this day, Iran has not disclosed the terms of Jason's supposed conviction or sentence.

9.     In reality, Jason committed no crime and was never legitimately tried, convicted, or sentenced—even according to Iranian standards.  Iran arrested and imprisoned Jason not

because of anything he did, but rather because of Iran's perception of his "value" as a dual citizen of the United States and Iran and a prominent journalist writing for a major U.S. news organization.  Iranian officials saw opportunity in Jason as a high-profile prisoner who would be valuable in a trade to the United States and could be exchanged for something of significance to Iran.

10.    On January 16, 2016, Iran exchanged Jason and three other U.S. nationals in Iranian custody for seven Iranian nationals held by the United States.  Around the same time, the United States lifted longstanding economic sanctions against Iran and released approximately $100 billion of previously frozen Iranian assets under terms of the nuclear agreement among Iran, the United States, and others.  The United States also paid to Iran roughly $1.7 billion in cash for the settlement of a longstanding Iranian property claim seeking the return of funds that had been deposited by Iran in the United States prior to the 1979 revolution and then subsequently frozen by the U.S. Government after Iran stormed the U.S. Embassy in Tehran and took 52 American diplomats and citizens hostage.  According to the United States, the $1.7 billion payment was comprised of $400 million in principal, plus a negotiated compromise of $1.3 billion in interest accrued since 1979.

11.    Although Jason survived and was released as part of the U.S.-Iranian prisoner exchange, Iran and the IRGC had already inflicted deep and permanent injuries on him, his wife, his mother, and his brother.  For 544 days, Jason suffered such physical mistreatment and severe psychological abuse in Evin Prison that he will never be the same; he will require specialized medical and other treatment for the rest of his life.  Yeganeh, Mary, and Ali each suffered their own extreme psychological trauma.  For 544 days, they lived with the

terror of knowing that Jason was being held in unthinkable conditions and that he might be tortured to death, executed, or held forever in Evin Prison.  With the knowledge that Jason was being abused in Evin Prison and might not survive, Yeganeh, Mary, and Ali were under severe psychological distress and suffered their own serious health problems.

12.     Plaintiffs' pain, anguish, and anxiety are likely to persist for years to come.  Plaintiffs live in constant fear that Iranian agents are spying on them, plotting additional acts of terrorism, and planning ways to hurt them and their family members again.  Plaintiffs fear that Iran will retaliate in some fashion against them and their family members for filing this Complaint, as Iran did in July 2015 when the family supported a petition before the United Nations ("U.N.") Working Group on Arbitrary Detention calling for Jason's release.

13.     Plaintiffs' injuries extend well beyond the deep and lasting psychological impacts of Iran's crimes.  As a direct result of his mistreatment by Iran and its agents, Jason will never feel safe living or working in or even near Iran as long as the current regime remains in power.  He and his wife cannot pursue the life they had planned for the future, which included starting a family in Iran, raising children near Yeganeh's family in Tehran, splitting their time between Iran and the United States, and pursuing journalism careers in both countries.  The careers and lives they led prior to their arrest abruptly came to an end on July 22, 2014.  They have no choice but to start over, without their jobs and networks of support in Iran.  Tragically, Jason and Yeganeh likely will be unable for the rest of their lives to reunite in Tehran with Yeganeh's family—including her mother, father, and two sisters—with whom both Jason and Yeganeh are extremely

close.  Moreover, they may never again see or spend time with many other family members, friends, and colleagues in Iran.

14.     Despite the severity of their injuries, Plaintiffs are committed to putting their lives back together.  One critical element of this effort is holding Defendants accountable in this Court for the terrorism, torture, hostage taking, and other abuses they committed against Jason, Yeganeh, and their family.  Congress enacted the "terrorism exception" to the FSIA for exactly this circumstance—to provide plaintiffs with an "economic weapon" against rogue states that "consider terrorism a legitimate instrument of achieving their foreign policy goals."  H.R. Rep. No. 104-383, at 62 (1995).  For nearly eighteen months, Iran held and terrorized Jason for the purpose of gaining negotiating leverage and ultimately exchanging him with the United States for something of value to Iran. Plaintiffs seek justice and redress from this Court in order to compensate Plaintiffs for their pain and suffering and to hold Iran accountable for its heinous and unlawful acts of terrorism, torture, abuse, and hostage taking.

## PARTIES

15.     Plaintiff Jason Rezaian was born and raised in the United States.  He is a U.S. citizen and a resident of California.  Jason is the son of an American mother, Plaintiff Mary Rezaian, and an Iranian father, Taghi Rezaian, who emigrated to the United States in 1959 and is now deceased.  Iranian law conferred citizenship on anyone born to a father who was an Iranian citizen, making Jason a dual national of the United States and Iran.  Jason moved to Iran in 2009 to work as a freelance reporter and established himself as an accomplished and respected journalist.  While serving as *The Washington Post*'s Tehran correspondent, Jason was unlawfully arrested and detained by the Iranian Government,

without legal justification or due process of law.  Jason was held hostage for 544 days in Evin Prison, where he was subjected to grueling, full-day interrogation sessions involving severe physical and psychological strain.   He was intimidated, disoriented, and blindfolded when transported around the prison; held in solitary confinement; denied access to counsel; denied visitation by Swiss consular officials[2] and family members; psychologically abused; and faced with threats of physical violence and harm to his wife and other family members.  Jason was also denied timely and adequate medical care for serious medical conditions and illnesses including high blood pressure, respiratory complications, and chronic infections of the eyes and urinary tract.

16.    Plaintiff Ali Rezaian was born and raised in the United States.  He is a U.S. citizen and a resident of California.  Like Jason, he is also a dual national of the United States and Iran by virtue of his father's Iranian citizenship.  He is Jason's older brother and Yeganeh's brother-in-law.  During the eighteen months when Jason was unlawfully held hostage by Defendants, Ali quit his job and worked tirelessly on a full-time basis to secure his brother's release.  This work put a significant strain on his family, his relationships, and his professional life.  The severe abuse being endured by his brother caused Ali himself to suffer in ways that significantly affected his physical and psychological health.  He contemplated suicide in the fall of 2015, having lost faith that his brother would ever be released.  At the time, Ali believed that only by ending his own life could he prompt action by Defendants or others, to free Jason.

---

[2] Switzerland is the Protecting Power in Tehran for the United States, which does not have formal diplomatic relations with Iran.

17.   Plaintiff Mary Rezaian, now 74 years old, was born and raised in the United States; she is a U.S. citizen and a resident of California and Turkey.  In 1968, Mary married Jason's and Ali's father, an Iranian national.  Under Iranian law, citizenship was automatically conferred to any woman who married an Iranian citizen, making Mary a dual national of Iran and the United States.  She is Jason's and Ali's mother and Yeganeh's mother-in-law.  From September 2011 until March 2013, Mary lived with Jason in Tehran.  In March 2013, she moved to Istanbul.  After Jason was arrested, Mary moved back to Tehran in December 2014 to support her son and pursue his release.  While in Iran, she was regularly subjected to threats by Defendants and to hostility by her Iranian neighbors.  Jason's suffering—which Mary observed during visits to Evin Prison—caused his mother pain, anguish, and anxiety.  She continues to worry that Jason's detention has forever traumatized her sons and their immediate family members and has permanently altered their relationships with one another and with their other family members and friends.

18.   Defendant the Islamic Republic of Iran is a foreign state.  Iran is a theocratic republic with an elected head of government and a head of state—the Supreme Leader—appointed for life by a council of theologians.  The Supreme Leader controls the Guardian Council of the Constitution, which interprets the Iranian Constitution, supervises elections (including by determining which candidates may run), and exercises significant influence over the legislative, executive, and judicial branches of government, as well as the military and IRGC.

19.   Defendant the Iranian Revolutionary Guard Corps or IRGC is a military organization under the control of the Guardian Council.  The IRGC was established in the wake of the

Islamic Revolution to act as the country's "ideological custodian"[3] and is generally understood to be one of the most reactionary, powerful, and oppressive factions of the Iranian Government. The IRGC fields an army, navy, air force, and intelligence service, and it conducts foreign operations through its paramilitary arm, the Quds Force. The Quds Force has primary responsibility for arming pro-Iranian military groups across the Middle East and beyond and has been designated by the U.S. Department of Treasury as a sponsor and supporter of terrorism.[4] The IRGC is particularly closely aligned with Hezbollah.[5]

20. Defendants, and other responsible agencies or instrumentalities of the Government of Iran, are each and collectively a "foreign state" within the meaning of the FSIA. *See* 28 U.S.C. § 1603.

## JURISDICTION AND VENUE

21. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1330, 1331, and 1605A.

22. This action falls within the "terrorism exception" to sovereign immunity under the FSIA, 28 U.S.C. § 1605A(a)(1), which provides, in relevant part, that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States … in any case … in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture … [or] hostage taking … if such act … is engaged in by an

---

[3] Greg Bruno et al., *Iran's Revolutionary Guard,* Council on Foreign Relations, http://www.cfr.org/iran/irans-revolutionary-guards/p14324 (last updated June 14, 2013).

[4] U.S. Dep't of Treasury, *Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism*, https://www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.pdf.

[5] *Id.*

official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

23. This suit seeks money damages against Iran and its agencies and instrumentalities for injury and harm caused to the Plaintiffs by acts of terrorism, torture, and hostage taking against Plaintiffs.

24. These acts of terrorism, torture, and hostage taking were perpetrated by officials, members, and agents of the IRGC and other agents and instrumentalities of Iran while acting within the scope of their official capacities.

25. Plaintiffs are U.S. citizens and nationals of the United States within the meaning of the FSIA, and were such at the time of the acts of torture and hostage taking alleged herein. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii) ("The court shall hear a claim under [the FSIA] if … the claimant or the victim was, at the time the act … occurred a national of the United States.").

26. Defendant Iran has since January 19, 1984, been designated a "state sponsor of terrorism" by the Secretary of State for purposes of section 6(j) of the Export Administration Act of 1979, section 620A of the Foreign Assistance Act of 1961, and section 40 of the Arms Export Control Act, and thus Defendants are a "state sponsor of terrorism" within the meaning of the FSIA.[6]  *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I) ("The court shall hear a claim under [the FSIA] if … the foreign state was designated as a state sponsor of terrorism at the time the act … occurred[.]").

---

[6]  *State Sponsors of Terrorism*, U.S. Dep't of State, http://www.state.gov/j/ct/list/c14151.htm (last visited Oct. 3, 2016).

27.     Venue for a civil action against a foreign state lies in this Court pursuant to 28 U.S.C.
        § 1391(f)(4) (venue is proper in the United States District Court for the District of
        Columbia "if the action is brought against a foreign state or political subdivision
        thereof").

## STATEMENT OF FACTS

### I.     JASON'S PROFESSIONAL PATH AND CAREER AS A REPORTER

28.     Jason was born in San Francisco, California, in 1976, and was raised in nearby Marin
        County, California.  His mother, Plaintiff Mary Rezaian, was born in Chicago, Illinois,
        and his father immigrated to the United States from Iran in 1959.

29.     Jason attended Tulane University and the University of San Francisco before graduating
        from the New School in New York City, New York, in 2001 with a bachelor's degree in
        cultural studies.

30.     Jason first visited Iran in 2001 with his father.  From 2001 to 2008, Jason visited Iran at
        least once every year.  During these visits, Jason developed an interest in and knowledge
        of the country's culture and its people.  He embarked on a career path seeking to inform
        Western understanding of Iran by accurately portraying the life and culture of its people.

31.     In May 2009, Jason moved to Iran to work as a freelance journalist.  As the only U.S.-
        Iranian journalist at that time working in Iran full-time, Jason quickly developed a broad
        professional network, reporting for news outlets including *Monocle*, *GlobalPost*, *The San
        Francisco Chronicle*, and *Slate*.

32.     In April 2012, Jason became the Tehran correspondent for *The Washington Post*, one of
        the premier newspapers in the United States.  As the *Post*'s Tehran correspondent, Jason
        researched and reported Iranian news and cultural events.  He provided fair, accurate, and

in-depth coverage of important domestic and international events, including the election of President Hassan Rouhani in 2013[7] and international negotiations over the fate of Iran's nuclear program.  In the process, Jason developed an extensive network of sources and contacts.  He frequently interviewed Iranian citizens and government officials about Iranian affairs.  He was also one of the few American journalists to be granted reporting credentials in Iran.  Jason was committed to providing neutral and comprehensive reporting about Iran to the rest of the world, while also respecting and complying with the strict rules for journalists in Iran.

33.     Notwithstanding his coverage of political issues—including rallies held by Mir-Hossein Mousavi, a reformist candidate during the 2009 election and leader of an Iranian opposition party—Jason complied with Iranian law and never had any significant problems with Iranian authorities.  From 2009 until his arrest, Jason's press credentials were reissued every year and he was never the subject of any formal complaint or investigation.

34.     Jason met Yeganeh, also a journalist, in Dubai in July of 2009.  The two began dating soon after Jason returned to Tehran, and they were married in 2013.  At that time, they planned to travel regularly between the United States and Iran, further pursue their international journalism careers, and eventually start a family in Iran.

---

[7] Jason Rezaian & Joby Warrick, *Moderate Cleric Hassan Rouhani Wins Iran's Presidential Vote*, Wash. Post (June 15, 2013), http://www.washingtonpost.com/world/iranians-await-presidential-election-results-following-extension-of-polling-hours/2013/06/15/3800c276-d593-11e2-a73e-826d299ff459_story.html.

II.   **The Political Environment In Iran At The Time Of Jason's And Yeganeh's Arrest**

35.   Iran's arrest and detention of Jason and Yeganeh occurred on July 22, 2014, during a very sensitive period in the relationship between the United States and Iran.  At the time of the arrests, Iran was involved in negotiations with the United States and other world powers regarding the Iranian nuclear program, including the potential lifting of economic sanctions against Iran in exchange for the dismantling of certain aspects of Iran's nuclear program.  Iran continued these negotiations despite pressure from hardline factions of the Iranian Government that opposed diplomatic engagement with the United States and the West.

36.   The United States initially imposed sanctions on Iran in 1979, following the Islamic Revolution, when 52 U.S. nationals were taken hostage for 444 days.  The two countries have had a contentious relationship ever since.  In 1987, the United States imposed an embargo on Iranian goods and services in response to its support of terrorism in the Persian Gulf.  Between 1995 and 1997, the United States effectively banned all trade and investment activities with Iran.[8]

37.   In 2006, the U.N. Security Council passed Resolution 1737 and imposed additional sanctions on Iran after it refused to suspend its uranium enrichment program.  The U.N. sanctions banned the supply of nuclear-related technology and materials to Iran and froze

---

[8]   *Timeline of Nuclear Diplomacy with Iran*, Arms Control Ass'n http://www.armscontrol.org/factsheet/Timeline-of-Nuclear-Diplomacy-With-Iran (last updated Aug. 2016); *see also* Kenneth Katzman, Cong. Research Serv., RS20871, *Iran Sanctions* 5-6 (2016), https://www.fas.org/sgp/crs/mideast/RS20871.pdf.

the assets of individuals and companies related to the enrichment program. These sanctions were strengthened in 2007 and again in 2010.[9]

38.   In 2006 and 2008, China, France, Russia, the United Kingdom, and the United States—the permanent members of the U.N. Security Council—along with Germany (together, the "P5+1") proposed framework agreements to halt Iran's uranium enrichment program. In 2009, the United States announced that it would participate fully in the P5+1 discussions with Iran and the P5+1 met with Iran to discuss the proposals in January 2011. These negotiations were suspended in the spring of 2013.[10]

39.   In August 2013, newly elected President Rouhani called for Iran to resume serious negotiations with the P5+1 over Iran's nuclear program. Negotiations between the P5+1 and Iran intensified over the following year.[11]

40.   The nuclear negotiations between Iran and the P5+1 caused significant tension between Defendant IRGC and Iranian President Rouhani's comparatively more progressive administration.[12]   High-level IRGC officials criticized and sought to undermine the Rouhani administration's efforts to engage with the United States and other Western powers over Iran's nuclear program.[13]

---

[9] Arms Control Ass'n, *supra* note 8.

[10] *Id.*

[11] *Id.*

[12] President Rouhani's electoral victory in 2013 was opposed by Iran's hardline factions. Although President Rouhani's election was welcomed as a sign of modest progress toward reform and potential partial reconciliation with the West, Rouhani's authority has remained subject to the authority of the Supreme Leader.

[13] *E.g.*, Marcus George, *Iran: Hardline Anxiety Over Rouhani Grows More Acute*, BBC (May 11, 2014), http://www.bbc.com/news/world-middle-east-27337623.

41.    In July 2014, Iran and the P5+1 met in Vienna to discuss a comprehensive nuclear agreement.   The parties also announced Iran would convert 25 kilograms of enriched uranium powder into fuel plates that could not be used for weapons and blend down another three tons of enriched uranium to make it unfit for weapons.   In exchange for these concessions, the P5+1 committed to repatriating $2.8 billion in funds.   The parties agreed to resume talks in August 2014.[14]

### III.    IRAN'S ARREST OF JASON AND YEGANEH

42.    On July 22, 2014, Jason and Yeganeh were arrested by Defendants' agents.   Jason, Yeganeh, and an acquaintance visiting their home at the time took an elevator to the ground floor of their apartment building and were accosted by two Iranian agents with guns drawn.   Defendant agents told Jason and Yeganeh they had a warrant for their arrest and forced them at gunpoint back up to their apartment.   Defendant agents ignored Jason's requests to see the warrant.

43.    Jason and Yeganeh were forcibly held in their apartment while approximately 20 agents of Defendants ransacked their residence and confiscated their belongings, including currency, bank cards, jewelry, passports, phones, computers, cameras, and other electronics and personal property.   The agents forcibly demanded and obtained the passwords to Jason's and Yeganeh's electronics, email accounts, social media accounts, and bank accounts, as well as access to their personal safe.   The agents brandished their firearms, used force to restrain Yeganeh, and threatened to kill Jason.   Defendants' agents were wearing plain clothes with surgical masks, presumably so they could not be identified.

---

[14] Arms Control Ass'n, *supra* note 8.

44.     After approximately one hour, Defendants' agents forced Jason and Yeganeh at gunpoint into the elevator, down to the lobby, and out to a van parked near the apartment building. Once inside the van, Jason and Yeganeh were handcuffed, blindfolded, and told to sit still and remain silent.

**IV.     IRAN'S IMPRISONMENT OF JASON AND YEGANEH**

45.     Jason and Yeganeh were taken to the Evin Detention Center inside Evin Prison in Tehran.  Evin Prison detainees, many of whom are hostages and political prisoners, are routinely forced to endure torture, extensive physical mistreatment, and psychological abuse, including harsh and relentless interrogations, threats of violence and execution, prolonged periods of solitary confinement, and other cruel, degrading, and inhuman treatment.[15]

46.     Upon arrival, Jason and Yeganeh were separated from each other and interrogated.

47.     The next day, Jason and Yeganeh were brought to the Media Court, the division of the Islamic Revolutionary Courts responsible for overseeing charges against members of the domestic and foreign media.

48.     The Islamic Revolutionary Courts hear cases involving alleged crimes against national security and acts against Islam.  These courts are closely aligned with Defendant IRGC and its intelligence service.  As one human rights advocate observed, the Islamic

---

[15] *See* Perry Chiaramonte, *Hell on Earth:  Inside Iran's Brutal Evin Prison*, Fox News (Jan.   28,   2013),   http://www.foxnews.com/world/2013/01/28/inside-evin-look-at-world-most-notorious-political-prison.html.

Revolutionary Courts "work hand in hand with the intelligence service officers and to a great extent follow the instructions from them."[16]

49.   After questioning Jason and Yeganeh, the presiding judge concluded that Jason would be required to stay in prison for a secondary investigation—without disclosing the evidence against him—but indicated that Yeganeh would be released on $6,000 bail.  The reality was much different.  Jason was imprisoned for 544 days, for reasons having nothing to do with any secondary investigation, and Yeganeh was imprisoned for 71 more days and her bail amount was set at approximately $32,000.

50.   Jason was kept in solitary confinement for approximately 50 days.  During that time, he was held in a concrete cell measuring roughly eight feet long by four feet wide.  The cell was cold, damp, dirty, and infested with cockroaches and other insects.  While in solitary confinement, Jason suffered from anxiety, depression, and severe hallucinations, such as perceiving the walls to be moving and talking.

51.   To deprive Jason of sleep, Defendants illuminated Jason's cell at all times and used a loud fan.  For the first four months of his imprisonment, Jason was forced to sleep on the floor with only a scrap of rug separating him from the cold, damp concrete.  Prison officials eventually gave Jason tranquilizers to induce sleep.

52.   On or around the fiftieth day of his detention in solitary confinement, Jason was told he would be moved to a different cell.  Defendants told him he might not be safe with the prisoners with whom he would be housed.  Later that evening, they moved Jason to a larger cell with another prisoner.  He was blindfolded when transported to his new cell.

---

[16] *See* Saeed Kamali Dehghan*, Six Judges Accused of Leading Role in Iranian Crackdown on Free Speech*, The Guardian (July 31, 2014), http://www.theguardian.com/world/2014/jul/31/six-judges-iran-crackdown-journalists-activists.

53.     Jason was moved a third time to a larger, lower-level cell after a third prisoner was placed in his cell unit.  While in the third cell, Jason's cellmates rotated to and from the public ward of the prison, but Jason always remained in the isolated cell.

54.     Aside from when he was interrogated, the only time Jason was allowed out of his cell was for two daily twenty-minute blindfolded walks in the yard, once in the morning and once in the evening.  Eventually, he was allowed an hour of exercise per day.

55.     Jason received minimal food for much of his imprisonment, and much of the food he did receive was nutritionally deficient and, in some cases, contained concrete, rocks, dirt, or other foreign and inedible objects.

56.     Jason was repeatedly denied adequate medical care and attention during his imprisonment.  Jason suffers from high blood pressure, which worsens in times of acute stress.  Yet, prison officials deprived him of his prescribed blood pressure medication for part of his imprisonment.  Jason was acutely aware that without proper treatment, his uncontrolled high blood pressure could cause life-threatening problems, which only added to his stress.  Officials eventually forced Jason to purchase what they claimed was an Iranian version of his medication.

57.     While in prison, Jason developed respiratory problems and related complications, which went untreated and linger to this day.  Jason may have been exposed to mold and asbestos, which remain prevalent in buildings in Iran.[17]  Jason also developed persistent eye and urinary tract infections.  Jason was not provided mental health care, despite

---

[17] *See* Gholamreza Pouryaghoub et al., *Exposure to Asbestos in Patients with Malignant Mesothelioma in Iran*, 72 Tehran Univ. Med J. 79, 79-86 (2014)*,* http://tumj.tums.ac.ir/article-1-5937-en.html.

explicit and repeated requests for help managing his severe depression and suicidal ideations.

58.     As a result of stress, inadequate nutrition, and the cumulative effect of his mistreatment, Jason rapidly lost a dramatic amount of weight—roughly 50 pounds—while imprisoned. He also suffered from severe digestive discomfort and intestinal issues that went untreated.

59.     Iranian officials interrogated Jason multiple times a day during the first three months of his imprisonment.  During those interrogations, Jason generally was blindfolded and taken to an underground room where his interrogators questioned him for hours at a time. For roughly 37 days, the only human interaction Jason had was with his guards and interrogators.  When Jason asked his interrogators why he had been arrested, or if he could speak to an attorney, they told him that he did not have the right to ask those questions.  Jason continued to be interrogated regularly until his release.

60.     The interrogators compelled Jason to write answers to their questions and repeatedly tried to coerce him into writing a false confession.  Prison officials took portions from those written responses, translated them into Farsi, and then attempted to force Jason to sign them without explaining what the revised and translated confessions said.  After his first court appearance, prison officials attempted to force Jason to confess to the fallacious allegations on video.  They told him that confessing on video would be his only chance to get out of prison.

61.     Interrogators often used harsh coercive tactics to persuade Jason to confess to their accusations.  For example, one interrogator would threaten Jason with execution by beheading while the other would tell Jason that they wanted to release him.  They

threatened Jason with physical mutilation, such as cutting off his limbs, and repeatedly told Jason that he would never see Yeganeh alive again.  Interrogators also threatened to harm Yeganeh if Jason did not cooperate.

62.   Before the U.N. General Assembly meeting in September 2014, officials interrogated and recorded Jason eight hours a day for five consecutive days.  They forced him to read statements to the camera, often demanding that he speak more forcefully.  It is believed that this was done in an attempt to provide Iranian officials with a pretextual justification for Jason's detention so that, in response to questions and criticism raised at the General Assembly, they could claim to have a legal basis for holding Jason.

63.   Jason was permitted to see Yeganeh a mere three times while she was imprisoned: once for a short three-minute meeting their first day in prison; again on around the forty-seventh day; and again on Yeganeh's last night in prison.

64.   Yeganeh was kept in solitary confinement for 69 of her 72 days in prison.  She was held in a windowless, six-foot square concrete cell that was infested with cockroaches and other insects.  She spent the first 12 days without ready access to a bathroom.  She was unable to shower or clean herself throughout this 12-day period.  While in solitary confinement, Yeganeh heard other inmates screaming in despair throughout the night and believed they were being physically harmed.  She was then moved to a cell with a bathroom, where she remained for the next 60 days.  A second woman was placed in Yeganeh's cell during her last three days in prison.

65.   Yeganeh was verbally abused by her guards, forced to perform degrading tasks, and subjected to physical mistreatment and psychological torment.  She feared for her safety and was under a constant threat of abuse and sexual violence.  Her interrogators would

violently lash out by hitting the table, breaking glass, or kicking her chair; because she was blindfolded, these unexpected outbursts were particularly frightening.  Like her husband, Yeganeh was threatened with prolonged or permanent detention, dismemberment, and execution.  She was also told that she would be taken to watch Jason be executed.  Yeganeh's interrogators also threatened to arrest her sister and physically harm other members of her family living in Tehran.

66.     Yeganeh's physical condition deteriorated to such an extent that, by the time of her release, she no longer could sit without losing feeling in her legs or fainting.  Her hair grew matted and had to be shaved completely upon her release.  Yeganeh also developed skin lesions given the poor hygienic conditions in which she was held.

67.     Yeganeh was interrogated every day for two four-hour sessions with a short break in between.  She often was not allowed to drink water for 19 hours each day.

68.     Most of the interrogators questioned Yeganeh about Jason.  Yeganeh was repeatedly forced to write false "confessions" of Jason's alleged crimes and false descriptions of his allegedly bad character and behavior.  The interrogators forced her to disclose his fears, weaknesses, and vulnerabilities, presumably to exploit them.

69.     Throughout her confinement, Yeganeh's interrogators made unsubstantiated accusations and threatened her with extended detention and physical violence.  During one interrogation session, Yeganeh's interrogators told her that she would be held in prison for 20 years, that they would cut off her right hand and left leg or her right arm and left leg, and that they would murder Jason by throwing him from the top of a cliff.  Those officials also told Yeganeh that Jason would be physically harmed or killed if she did not cooperate and provide them with incriminating information involving Jason.

**V.      YEGANEH'S RELEASE**

70.      On October 5, 2014, Yeganeh was released after 72 days of detention.  Yeganeh's release

came with virtually no advance communication or explanation.

71.      The night before her release, a guard instructed her to put on a hijab.  She was told she

"had somewhere to go," but was not told where.  Her guards escorted her to see Jason,

who was in terrible condition.  That visit—and the searing vision of Jason suffering and

in pain—would haunt her for the duration of Jason's imprisonment, which lasted nearly

500 more days.

72.      The following morning Yeganeh was interrogated as usual, with no indication she would

be released.  That evening, however, a guard brought Yeganeh her own clothes, as her

captors would be filming her and wanted to create the false impression that she had been

well treated during her confinement.

73.      Yeganeh was blindfolded and taken to her standard interrogation room, where a video

camera had been set up.  Yeganeh's interrogators informed her that she would be asked a

series of questions; if she "was a good girl" and answered the questions to her

interrogators' satisfaction, she would be released to her parents' care.  If not, "who knows

what's going to happen," they said.

74.      As part of this charade, Yeganeh was required to provide a "confession" that Jason was a

spy.  Her interrogators told her what they wanted her to say.  Each time her statement did

not hew to the preferred script, the camera was stopped and she was told how to revise

her statement to satisfy her interrogators' needs.

75.      Once her forced confession was deemed satisfactory, Yeganeh was required to fill out a

set of documents through which she foreswore any right to practice journalism while her

husband remained in prison.  There was, however, no indication of Jason's status or whether he would ever be released.  Yeganeh also was required to swear that no one in her family would speak to the media, and that she would not use or have any presence on social media.

76.     Yeganeh's belongings were not returned to her upon her release.  Instead, Iran continued to hold her laptop, phone, camera, banking information and materials, passport and travel documents, and other valuables taken from her apartment.  She was forbidden from leaving the country, though that admonition was irrelevant, as she no longer had a passport or identification documents.

77.     Yeganeh was blindfolded and taken to a car by one of her interrogators.  She was driven to a Tehran street corner, where her parents were waiting—having received a tip from her captors.  Yeganeh later learned that her parents had been required to make a significant "bail" payment as another condition of her release (approximately $32,000), which was provided by her brother-in-law, Plaintiff Ali Rezaian.

78.     Yeganeh was held in solitary confinement for all but three days of her 72-day detention.  The combination of solitary confinement, deplorable conditions, death threats, and psychological manipulation left Yeganeh in extremely poor mental and physical condition upon her release.  She developed respiratory and skin conditions that required her to shave her head.  She contemplated suicide and was consumed by fear of what would happen to Jason in prison.  Yeganeh's captors were fully aware of her condition: upon her release, they informed her parents that she should not be left alone, even for limited periods of time.  They warned that a number of former inmates had committed suicide shortly after release from Evin Prison.

79. Although she continued to pay rent, Yeganeh was unable to return to her and Jason's apartment because of her landlord's fear of retaliation against him by the IRGC. She ultimately sold many of her furnishings, forfeited her approximately $8,000 apartment deposit, and moved in with her parents so she could focus on her physical recovery and efforts to secure her husband's release.

80. After a period of weeks, Yeganeh was allowed infrequent, brief visits with her husband at the prison, where she was sometimes forced to change back into a prison uniform and often was threatened with continued detention. Aware that she remained vulnerable, her former captors routinely threatened her during these visits as a means of intimidating and controlling her and Jason.

## VI.   JASON'S TRIAL

81. Through the fall and winter of 2014, Yeganeh, Ali, and Mary persistently sought to learn the charges against Jason, but to no avail. They were never told what the charges were, and the charges were never announced publicly.

82. Yeganeh eventually learned—after the fact—that her husband had been charged in a closed court proceeding on December 7, 2014, with espionage and cooperating with a hostile government. Jason was denied legal representation during this initial hearing and was accompanied only by a government-appointed Farsi interpreter. Although Jason speaks conversational Farsi, his familiarity with that language is not sufficient for use in a legal proceeding, and his interpreter's English-speaking skills were also very limited.

83. On January 14, 2015, Jason's case was transferred to Branch 15 of the Revolutionary Courts. On February 1, the case was assigned to Judge Abolghassem Salavati. In 2011, the European Union sanctioned Judge Salavati for human rights violations, including

presiding over "show trials" and sentencing more than one hundred demonstrators, political prisoners, and human rights activists to lengthy prison sentences.[18]

84. Jason's family had a number of lawyers they wanted to use, but Defendants would not allow Jason or his family to retain any of their preferred counsel.  The family struggled to retain a lawyer deemed suitable by the court.   Prior to the so-called "trial," Jason provided Judge Salavati with a list of attorneys that he wanted to represent him, including Masoud Shafii, an Iranian lawyer with experience handling high-profile political cases in the Revolutionary Courts.  Judge Salavati rejected Shafii and the other attorneys because they were not allowed in his court.  When Jason protested, Judge Salavati stated that he was the judge and that he had the right to say who defends clients in his court. Defendants' agents later showed up at Jason's cell with a contract stating that Leila Ahsan, Yeganeh's attorney, would represent him at trial.

85. Jason was permitted to meet with Ms. Ahsan only twice—for a total of 90 minutes— before his trial commenced, but never in private and never to discuss his defense.  During those meetings, Judge Salavati, the prosecutor, and an official interpreter were all in the room with Jason and Ms. Ahsan.  Jason and Ms. Ahsan were not allowed to discuss his case or prepare for trial.  When Jason asked about the charges against him, Judge Salavati declined to disclose any particulars and informed him only that the charges carried a death sentence.

86. Although Iranian law requires that a trial date be announced ten to 12 days beforehand, Jason's first trial date was informally announced in a newspaper interview with an

---

[18]  Council Regulation 359/2011, annex I, 2011 O.J. (L 100) 1, 6 (EU), http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:32011R0359.

Iranian government official just five days before it was scheduled to commence.  No notice was sent to Jason or his attorney.  Jason was sometimes informed of his trial dates shortly beforehand by Yeganeh, or at other times by prison guards the night before he was due in court.  Those guards told Jason that they could lose their jobs, or worse, for alerting him of an impending trial date.

87.    Jason's "trial" was a complete sham.  It consisted of four perfunctory hearings on May 25, June 8, July 13, and August 10, 2015.  No evidence or witnesses were presented, and Jason had no opportunity to present a defense.  After each proceeding, the trial was adjourned and delayed without explanation.  Various media outlets deduced that the timing of the hearings, coupled with the seemingly random delays, indicated that the trial was being driven in some form by the pace of the P5+1 nuclear negotiations.  *See infra* ¶ 131.

88.    During the trial, Jason was prohibited from speaking with either his lawyer or with the prosecutor.  He could communicate only with the judge or the government interpreter who reported to the judge.  The interpreter deliberately mistranslated Jason's statements and altered his words to make them sound incriminatory.

89.    Judge Salavati personally insulted and verbally assaulted Jason from the bench during the proceedings.  Jason requested permission to call witnesses to speak on his behalf, but the Judge denied those requests.  Before each of Jason's trial hearings, a passage was read from the Quran stating that the person before the court was an enemy of God; this is the same passage that typically is read when the Iranian Government conducts an execution.

90.     Over the course of Jason's trial, Ms. Ahsan (Jason's counsel) was herself detained and interrogated by Iranian officials on approximately four occasions.  She was not permitted to present Jason's defense.

91.     Mary and Yeganeh attempted to attend each of Jason's court appearances, but were barred from the courtroom by IRGC agents.  Jason's employer, *The Washington Post*, also sent a letter requesting permission to attend the courtroom hearings; Iran never responded.

92.     Public reports indicated that Judge Salavati reached a verdict—guilty—in Jason's case in early October 2015.[19]  Those reports did not disclose the nature of the crime or the particulars of the supposed judgment.  Neither Jason nor his counsel were ever informed of the verdict or the terms of any judgment.  On November 3, 2015, Ms. Ahsan was told that the trial had not in fact concluded, and that an additional hearing would be held on November 16.  No such hearing took place.  On November 22, 2015, the Iranian judiciary told the press that Jason had been sentenced to an unspecified prison term.  Again, neither Jason nor his counsel was ever informed of the terms of the sentence.

## VII.   THE REZAIAN FAMILY'S AND *THE WASHINGTON POST*'S EFFORTS TO FREE JASON

93.     On the night of July 23, 2014, the foreign editor of the *Post* told Jason's brother, Plaintiff Ali Rezaian, that Jason had been arrested.  Ali informed his mother, Mary, early the next morning.  The Iranian Ministry of Foreign Affairs acknowledged that Jason and Yeganeh had been arrested but refused to disclose why they were arrested, who arrested them, whether there was a warrant for their arrest, or where they were being held.  Several

---

[19]   Lauren Gambino, *Jason Rezaian Convicted in Secret Iran Espionage Trial, Washington Post Says*, The Guardian (Oct. 12, 2015, 1:49 PM), https://www.theguardian.com/world/2015/oct/12/jason-rezaian-convicted-iran-trial-washington-post.

weeks passed before Ali and Mary learned that Jason and Yeganeh were being held in Evin Prison.

94.     Iranian officials then embarked on a deliberate effort to misinform the Rezaian family of Jason's and Yeganeh's legal and physical status.  Government officials initially refused to provide details about Jason's and Yeganeh's arrest or imprisonment to Ali, Mary, or Yeganeh's family.  Iranian officials told Yeganeh upon her release that Jason would be set free in one or two weeks.  Ali, Mary, and Yeganeh later received conflicting reports about Jason's confinement and his possible release.  Over the course of his 18 months of confinement, Jason and his family were told at different times that he would be released immediately, in the coming week, when some vague concessions were made, or alternatively, that he would spend the rest of his life in Evin Prison.

95.     Defendants caused Jason's family to feel terrorized and helpless.  Ali has described Iran's conduct as intentionally designed to traumatize Jason and the people who care about him.

96.     Mary traveled from Istanbul to Tehran in December 2014 to be closer to the prison and to try to secure her son's freedom, staying for several weeks with Yeganeh's family in Iran. She returned to Istanbul in January after being assured by Iranian officials that she would be informed of Jason's trial dates.  Because of the prolonged delay in setting a court date, she returned to Tehran in May 2015.  She was advised to stay in a hotel rather than renting an apartment in order to avoid harassment by the IRGC.

97.     Yeganeh's Iranian family lived throughout Jason's detention in a mixed state of shame and fear.  They were shunned by friends and neighbors and threatened with physical violence.  They feared constantly for their own safety as well as the safety of their

daughter and their son-in-law.   During the weeks Mary lived with them, the living situation was trying and tense.

98.    Mary and Yeganeh did all they could to obtain Jason's release.   They pleaded with Iranian officials and confronted the judge handling Jason's case.   Because Yeganeh was forbidden to speak to the media as a condition of her release, Mary was their voice in the Middle East—publicly protesting in Istanbul and Tehran, speaking out in the media, and working tirelessly with Ali to pressure Defendants to free Jason.

99.    Ali—an entrepreneur who owns his own company—set aside his professional responsibilities and devoted his life to securing his brother's release from prison.

100.    Leaving his wife and young son behind in California, Ali took dozens of trips to meet with U.S. and other officials in Washington, DC, New York, Geneva, and elsewhere. Although he is a very private person, Ali appeared routinely on television, held press conferences, organized campaigns on social media, led public protests, testified before Congress, collaborated with Jason's supervisors and other leaders of *The Washington Post*, traveled to Geneva to present Jason's case to the U.N. Human Rights Council, and engaged with dozens of representatives of the U.S. Government, foreign governments, multilateral institutions, and non-governmental organizations ("NGOs").

101.    Ali focused his advocacy efforts on the U.S. Congress, the White House, U.S. and foreign diplomats, and the media.   He met with U.S. Department of State and congressional officials several times per month during his brother's detention.   In June 2015, Ali testified before the U.S. House Committee on Foreign Affairs, urging Congress to act on his brother's behalf.   He attended the meeting of the U.N. General Assembly in the fall of 2015.

102. On July 21, 2015—the anniversary of Jason's detention—Ali collaborated with *The Washington Post* to oversee the filing of a petition with the U.N. Working Group on Arbitrary Detention ("UNWGAD"), which urged the United Nations to declare Iran's detention of Jason to be arbitrary and unlawful, and sought urgent action in his case.

103. Ali also traveled to Geneva to address the U.N. Human Rights Council in Geneva in September 2015.  He described the nature of the petition and advocated forcefully for Jason's release.  In response, Defendants' agents surveilled and harassed Ali and his counsel by following them around the U.N. complex for three days and attempting to eavesdrop on, record, and photograph their activities, including private meetings with representatives of Member States and NGOs.  When Ali made his presentation to the plenary session of the Human Rights Council, several members of the Iranian delegation occupied the seats immediately surrounding him and conspicuously photographed and recorded the activities with the apparent intention of intimidating and distracting Ali as he sought to tell his brother's story, describe Iran's violations of international law, and advocate for Jason's release.  Mary and Yeganeh were also harassed by IRGC agents in Iran around the time of Ali's presentation to the United Nations.  Mary was held against her will in a vehicle by IRGC agents; Yeganeh was detained and interrogated inside Evin Prison, where the guards forced her to change into a prison uniform and threatened to imprison her again.

104. Over the course of his brother's detention, Ali appeared on several dozen news networks, radio shows, and met with countless reporters.  He appeared on media programs more than 200 times in an effort to highlight Jason's case and put pressure on Defendants to release him.

105.    Ali's efforts on his brother's behalf required nearly constant travel and extended absences from his wife and son in California, and exacted a heavy physical, emotional, and financial toll.  *See infra* ¶¶ 141-144.  Ali spent in excess of $100,000 in his relentless pursuit of justice for his brother.

106.    Jason's employer, *The Washington Post*, also was relentless in its pursuit of Jason's freedom.  From the moment Jason and Yeganeh were taken into custody to the moment that Jason was released, the *Post* made every effort to free Jason.  Thanks to the leadership of the *Post*'s owner, publisher, editors, counsel, and others, that commitment never wavered.  The *Post* worked tirelessly to raise awareness of Jason and Yeganeh's plight and to call for their release.  The *Post* also supported the efforts of the U.S. Government and pursued other political, diplomatic, and legal avenues to advance Jason's cause in domestic and foreign venues, including by funding and overseeing the filing of the UNWGAD petition against Iran.  The *Post* remained engaged in the effort to secure Jason's freedom for the entire 544 days of his ordeal and played an integral role in his ultimate release.

107.    The UNWGAD issued an opinion on January 18, 2016, finding that the Iranian Government had subjected Jason to arbitrary and unlawful detention in violation of international law.  Specifically, the UNWGAD found that the Iranian Government had "not offered any explanation of the legal provisions justifying Mr. Rezaian's arrest and continued detention" and had "not clarified the charges against Mr. Rezaian, nor … demonstrated how Mr. Rezaian's activities could have amounted to the crimes for which he was prosecuted."  The UNWGAD concluded that Jason had been "deprived of the right to be informed of the charges against him, the right to counsel of his choosing, the

right to adequate time and facilities to prepare a defense, the right to be presumed innocent, the right to be tried without undue delay, the right to an independent and impartial tribunal, and the right to a public trial."[20]

## VIII. JASON'S RELEASE

108.  Jason was repeatedly and falsely informed by his captors that his release was imminent. He also was repeatedly told that he would die in prison.  Promises of potential release were used as a tool for Jason's interrogators to manipulate his responses to questions, leaving him in a constant state of uncertainty, anxiety, and ultimately despair.

109.  On January 4, 2016, Jason's primary interrogator, along with his supervisor, informed Jason that he would be released shortly, in exchange for several Iranian nationals imprisoned in the United States.  Jason was skeptical, believing that this information was yet another ploy by Defendants to deceive and exert control over him.

110.  The next day, the interrogator repeated the same information to Mary and Yeganeh during a prison visit.  Defendants alleged that Yeganeh would not be a part of the exchange, and that she would not be permitted to leave Iran.  The realization that he would be forced to leave his wife behind in exchange for his freedom caused Jason great anxiety.

111.  In the two weeks prior to Jason's release, Defendants attempted to coerce Jason into confessing to baseless accusations that he was guilty of espionage and conspiring with a hostile foreign government.  Defendants also forced Jason to apologize for his purported

---

[20] U.N. Working Group on Arbitrary Detention, *Opinion No. 44/2015 Concerning Jason Rezaian (Islamic Republic of Iran)*, U.N. Doc. A/HRC/WGAD/2015/44, ¶¶ 34, 36 (Dec. 16, 2015) (advanced unedited version), http://www.ohchr.org/Documents/Issues/Detention/Opinions2015AUV/Opinion%202015%2044_Iran_Rezaian_AUV.pdf.

crimes and request a written pardon from the Supreme Leader.  Jason was informed that his release depended on his full cooperation.

112.	After 544 days of confinement, Jason was released on January 16, 2016, along with three other American detainees.   In exchange for their release, the United States granted clemency to seven Iranian prisoners who were lawfully charged or convicted of sanctions violations.

113.	At or around the same time, the United States also lifted longstanding economic sanctions against Iran, which led to the release of approximately $100 billion of Iranian assets pursuant to the terms of the nuclear agreement between and among Iran, the United States, and others.

114.	Jason's release day was fraught with complications due to last minute efforts by the IRGC to thwart the exchange deal.  Prior to leaving Evin Prison, Jason was forced to shave his beard and dress in his wedding suit.  He was then subjected to an interview with IRGC authorities—with a local TV journalist present—that consisted of a series of misleading questions related to the crimes of which Jason had been accused.  Jason was asked to state falsely, on camera, that he was treated well and to admit that prisoners at Guantanamo Bay were subjected to far worse treatment by the U.S. Government.  At the conclusion of the interview, Jason was returned to his cell and subsequently escorted to a medical room for a cursory health review.  He was left alone in an empty room for approximately four hours without explanation as to the whereabouts of his wife and mother.

115.	Jason eventually was blindfolded and taken to the airport.  Upon his arrival, he was kept isolated in a frigid room, without access to food or water, for more than eight hours.

116.   Unbeknownst to Jason, around this time Yeganeh received a call from an unknown man who directed Yeganeh and Mary to proceed to the domestic terminal of the Tehran airport and await instructions.  A man in a surgical mask, whom Yeganeh recognized as an agent of the IRGC, demanded that the two women accompany him to the diplomatic terminal.  They eventually were permitted access to Jason, but only after providing false answers to questions from state-television journalists.

117.   After Jason had been waiting for several hours, a Swiss Embassy official visited Jason and informed him that Yeganeh and Mary would be permitted to leave Iran with Jason. After the visit concluded, however, IRGC officials yet again insisted that Yeganeh and Mary would not be leaving Iran and that they had never been a part of the deal with the U.S. Government.  These officials claimed Jason would be returned to Evin Prison if he continued to insist that Yeganeh and Mary accompany him out of Iran.

118.   Early the following morning, the IRGC official who had led the interrogations of Jason at Evin Prison informed Jason that the IRGC could no longer be responsible for his well-being and that he was being handed over to another agency of the Iranian Government, the Ministry of Intelligence and Security ("MOIS").  Before he was handed over to MOIS, the IRGC official forced Jason to sign a letter stating he would not hold the IRGC accountable for any injuries he sustained while in MOIS custody.  At the time of the hand over to MOIS, Jason had not slept in more than 36 hours.  He was dehydrated and his body shook with anxiety.  His heart raced and his concern grew that his blood pressure was spiking due to significant stress.

119.   Once in MOIS custody, Jason was transferred to the diplomatic terminal with the other American prisoners being released.  MOIS agents asked that Jason locate Yeganeh and

Mary and informed him the flight would depart in approximately six hours, with or without them.

120.    Through the intervention of the Swiss Government and high-level communications between U.S. and Iranian diplomats, Yeganeh and Mary ultimately were allowed to leave Tehran with Jason.  All three were flown with two other U.S. prisoners by the Swiss Government to Geneva, where they were turned over to the U.S. Government and flown by the U.S. Air Force to Germany.

121.    During the flight, Jason was examined by a Swiss-government-appointed physician. Jason's blood pressure was extremely elevated, and he was given a double-dosage of his blood pressure medication and a tranquilizer in an attempt to stabilize his system.  Once in Germany, he was put through a full series of medical examinations at Landstuhl Regional Medical Center, which confirmed that Jason's blood pressure was dangerously elevated.  He remained in the hospital for several days.

122.    Jason and his wife finally returned to the United States on January 22, 2016.

## IX.    EVIDENCE OF HOSTAGE TAKING

123.    For purposes of the FSIA, "hostage taking" requires only that the hostage taker sought to influence third parties by holding the plaintiff hostage.  The inquiry "focuses on the state of mind of the hostage taker" and does not require the plaintiff to demonstrate that the hostage taker ever communicated its demands to a third party.  *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 357 (D.C. Cir. 2006).  Here, Defendants plainly had the state of mind of a hostage taker and repeatedly communicated their intent to take and use Jason and Yeganeh as hostages.

124.    During Jason's and Yeganeh's time in Evin Prison, Iranian guards, interrogators, and

other officials repeatedly stated to both Jason and Yeganeh that Jason would be used as a

bargaining chip in a prisoner exchange.  Mary was also told on several occasions that her

son was being held for his "high value" for purposes of a prisoner exchange.  There are

many examples of such statements, including the following:

    a.    During Yeganeh's first interrogation, she was informed that there would be a

prisoner exchange for Jason.  She also was told that she would go home as soon

as she cooperated and answered their questions, but that Jason would remain in

prison until Iran could arrange a prisoner swap with the United States.  Yeganeh

believed that Defendants were holding her primarily as a means to control Jason

and induce his compliance with their interrogations and demands.

    b.    Jason's interrogators told him that they imprisoned him because he would be

valuable in any negotiations with the United States; they said that the United

States was imprisoning Iranian citizens for engaging in international trade that

benefited Iran, and that Iran needed valuable "assets" that it could exchange for

such prisoners.  He was told very early on in his interrogation sessions that he

would be exchanged for Iranian prisoners in U.S. custody.

    c.    Jason's interrogators attempted to coerce him into falsely confessing to being the

head of CIA operations in Iran.  When he responded that he was simply a

journalist, he was told this was unacceptable because a journalist would have less

"value" than a "spy" in any "swap" with the U.S. Government.

d.  Jason's interrogators told him repeatedly that his trial was not real.  Instead, he would get a sentence, "pay his bill," and then go home when Iran got what it wanted from the United States.

e.  Iranian officials told Jason before the U.N. General Assembly meeting in September 2014 that President Rouhani was going to New York, that Jason was going to be "swapped" for something of value to Iran, and that he might even be on President Rouhani's plane.  He was also told that the United States was not doing enough to promote a prisoner swap and was instructed to tell his mother, Mary, to tell President Obama to "do more."

f.  Yeganeh's interrogators told her to tell Jason's family that they must convey to President Obama to agree to "give more" or "do more" to get Jason released.

g.  Prison officials told Yeganeh that they wanted to swap Jason for Ali-Reza Asgari, an IRGC General and former Iranian Deputy Minister of Defense who disappeared in Istanbul, Turkey, in 2007 and who Iran believes was kidnapped by Western intelligence agencies.

h.  The day that Yeganeh was released, prison officials told her and her parents that there would soon be a prisoner swap for Jason's release, but that Yeganeh and her parents could not tell anyone.

i.  Mary met with IRGC guards and other Iranian agents on May 13, 2015.  During that meeting, the guards asked Mary if she could speak with Secretary of State John Kerry or Under Secretary Wendy Sherman about a potential prisoner swap for Jason.  Mary informed the Iranians that she was merely a private citizen and

that their request could only be resolved at the highest levels of the U.S. and Iranian governments.

125.     As reported in a wide variety of media sources, Iranian officials' public statements demonstrate that Iran arrested and imprisoned Jason as a hostage for whom it could obtain persons or assets of value in an exchange with the United States.  For example:

a.     In September 2015, President Rouhani suggested that "[i]f the Americans take the appropriate steps and set [Iranian prisoners] free, certainly the right environment will be open and the right circumstances will be created for us to do everything within our power and our purview to bring about the swiftest freedom for the Americans held in Iran as well."[21]

b.     On a separate occasion, when asked about Jason and rumors of a prisoner exchange, President Rouhani stated that "[w]e have Iranians who are imprisoned in the United States, Iranians who are being pursued, and most of them are being pursued for circumventing the sanctions."  He "consider[ed] all of those prisoners to be innocent and consider[ed] it wrong that they [were] in prison."  When pressed on whether he supported a prisoner exchange, he stated, "I don't particularly like the word exchange, but from a humanitarian perspective, if we can take a step, we must do it.  The American side must take its own steps."[22]

---

[21] Mick Krever, *Iranian Leader: Release our Prisoners, and We'll Consider Doing the Same*, CNN (Sept. 27, 2015), http://www.cnn.com/2015/09/27/world/rouhani-prisoners-iran-amanpour/.

[22] Thomas Erdbrink, *Amid Report of Jason Rezaian's Conviction, Iran Hints at Prisoner Exchange*, N.Y. Times (Oct. 12, 2015), http://www.nytimes.com/2015/10/13/world/middleeast/jason-rezaian-washington-post-conviction-iran.html.

c.   When asked for a practical way that Iran could release Jason and other U.S. prisoners, Ali Larijani, speaker of Iran's parliament, replied that "there is a number of Iranians in prison here [in the United States]." He then acknowledged that a prisoner exchange was a possibility.[23]

d.   Amir Hekmati, one of the U.S. prisoners released with Jason, accused Iran of "serial hostage taking" and of harassing his relatives to press for prisoner exchanges. He asserted that Iran had demanded the release of Iranians held in the United States as a condition for freeing him, and that he "assume[d] the same demands are being made for other U.S. captives."[24]

126.   Following the prisoner exchange, Iranian officials boasted that the United States returned $1.7 billion in frozen assets in return for Jason and three other Iranian-Americans.

a.   Brigadier General Mohammad Reza Naqdi, Commander of Iran's Basij Force, a paramilitary volunteer militia established in 1979 and engaged in internal security and law enforcement, stated that "[t]he annulment of sanctions against Iran's Bank Sepah and reclaiming of $1.7 [billion] of Iran's frozen assets after 36 years showed that the US doesn't understand anything but the language of force."[25] He

---

[23] Steve Inskeep & Bill Chappell, *Speaker of Iran's Parliament Suggests Prisoner Swap for Rezaian, Other Americans*, NPR (Sept. 3, 2015), http://www.npr.org/sections/thetwo-way/2015/09/03/437322607/speaker-of-iran-s-parliament-suggests-prisoner-swap-for-rezaian-other-americans.

[24] Rick Gladstone, *American Marine Veteran Held in Iran Assails 'Serial Hostage-Taking'*, N.Y. Times (Apr. 21, 2015), http://www.nytimes.com/2015/04/22/world/middleeast/american-marine-veteran-held-in-iran-assails-serial-hostage-taking.html.

[25] *Basij Commander: US Bought Freedom of Spies by Releasing $1.7 bln of Iran's Frozen Assets*, Fars News Agency (Jan. 20, 2016), http://en.farsnews.com/newstext.aspx?nn=13941030001016; *see also* Arash Karami, *Iran Denies US Gave Money in Exchange for Prisoners*, Al-Monitor (Feb. 17, 2016), http://www.al-monitor.com/pulse/originals/2016/02/jason-rezaian-prisoner-swap-exchange-for-money.html#ixzz4GgbmJjqu.   An editorial in

added that, "[t]his money was returned for the freedom of the US spy and it was

not related to the (nuclear) negotiations."[26]

b.      During a televised debate between President Rouhani's cultural adviser, Hesam

al-Din Ashna, and former President Mahmoud Ahmadinejad's culture minister,

Mohammad-Hossein Saffar Harandi, Harandi claimed that the United States paid

$1.7 billion in exchange for the hostages—and, in particular, for Jason.[27]

c.      Iran's Tasnim News Agency stated that "as Iranian and European officials were

announcing the implementation of the nuclear deal, the release of the prisoners

was taking place" and claimed that "$400 million was delivered to Iran in cash

[on] Jan. 17 at Mehrabad airport."[28]

d.      Javad Karim Ghodousi, a hardline member of Iran's Parliament, stated that Iran

"didn't give up anything and got everything [in the negotiations].  We gave [up]

Jason Rezaian—who/whose usefulness had been exhausted and would have only

manifested a loss from then on—and in return we got four concessions.  They

---

Iran's *Kayhan* newspaper, whose editor is directly appointed by the Supreme Leader, similarly claimed on May 1, 2016 that "the exchange of Jason Rezaian … led to the release of $1.7 billion of Iran's [frozen] assets" and "shows that the Americans only understand the language of power and pressure."  Kayhan (editorial), http://www.irna.ir/fa/News/82159094/ (translated from Farsi). Although the U.S. Government has disputed that any money was paid in exchange for the release of the Iranian-American prisoners, *see, e.g.*, Ron Allen & Erik Ortiz, *$400M Payment to Iran as Americans Freed Not a Ransom: White House*, NBC News (Aug. 3, 2016), http://www.nbcnews.com/storyline/iran-nuclear-talks/400m-payment-iran-americans-freed-not-ransom-white-house-n622196, it is the Iranian Government's intent that is relevant to the legal question of whether or not Jason was taken hostage, *see Simpson*, 470 F.3d at 357.

[26] *Basij Commander*, *supra* note 25.

[27] Karami, *supra* note 25.

[28] *Id.*

included the release of seven Iranians from U.S. prisons and the release of $1.7 billion in frozen Iranian assets[.]"[29]

127.   In addition to serving as currency for a prisoner swap, Jason's detention also was widely understood to be part of an effort by the IRGC to exert pressure on the nuclear negotiations and to extract concessions from the United States.  For example:

    a.   On July 25, 2014, the National Iranian American Council noted that "[t]he timing of these new detentions, coming just as nuclear negotiations opposed by some in Iran have been extended, adds further concern about this episode."[30]

    b.   On August 4, 2014, the director of the Middle East Program at the Woodrow Wilson International Center wrote in a *New York Times* op-ed that Jason's "arrest during the nuclear negotiations throws down a gauntlet to Washington, even as it warns Mr. Rouhani and his team against pursuing reconciliation with Washington too eagerly."[31]

    c.   On April 22, 2015, Reporters Without Borders noted that "Iranian opponents of the nuclear accord with the United States and better relations with the international community have been referring to the Rezaian case since 3 April,

---

[29] IRNA News Agency, July 22, 2016, http://www.irna.ir/fa/News/82159094/ (translated from Farsi).

[30] Press Release, National Iranian American Council, *NIAC Statement on Detention of Iranian-American Journalist* (July 25, 2014), http://www.niacouncil.org/niac-statement-detained-iranian-american-journalist/.

[31] Haleh Esfandiari, Opinion, *Jailing a Journalist to Shame Rouhani*, N.Y. Times (Aug. 4, 2014), http://www.nytimes.com/2014/08/05/opinion/haleh-esfandiari-jason-rezaians-arrest-in-iran-is-a-ploy-to-weaken-rouhani.html.

and this is no coincidence because Rezaian was arrested with the aim of being used in this all-out war between rival ruling factions."[32]

    d.    On May 27, 2015, *The New York Times* quoted "[a] former diplomat who has been involved in negotiations to free Americans held in Iran" as saying "it was possible [Iran] did not want to resolve the prisoner issue because it was part of a negotiating strategy."[33]

    e.    Politicians including Governor Scott Walker of Wisconsin and then-Speaker of the U.S. House of Representatives John Boehner described Jason and other Americans held in Iran as "hostages" or suggested that the nuclear negotiations should include their return.[34]

    f.    On August 17, 2015, the *Guardian*'s Tehran Bureau Correspondent asserted that "recent inadvertent revelations by Iran's members of parliament, as well as the Islamic Republic's historic penchant for prisoner swaps, suggest Rezaian may be the victim of a carefully orchestrated operation."[35]

---

[32] *Detained US Journalist Used in Iranian Power Struggle*, Reporters Without Borders (last updated Jan. 20, 2016), https://rsf.org/en/news/detained-us-journalist-used-iranian-power-struggle.

[33] Rick Gladstone, *Jason Rezaian Trial in Iran May Be More About Leverage Than Justice*, N.Y. Times (May 27, 2015), http://www.nytimes.com/2015/05/28/world/middleeast/jason-rezaian-trial-in-iran-may-be-more-about-leverage-than-justice.html.

[34] *E.g.*, *Statement by Governor Walker on Americans Being Held Hostage in Iran*, The American Presidency Project (July 22, 2015), http://www.presidency.ucsb.edu/ws/?pid=110761; Speaker Boehner's Press Office, *Iran Should Release These Four Americans*, Speaker.gov (May 28, 2015), http://www.speaker.gov/general/iran-should-release-these-four-americans.

[35] Tehran Bureau Correspondent, *Speculation Grows that Iran Willing to 'Swap' Washington Post Reporter*, The Guardian (Aug. 17, 2015), https://www.theguardian.com/world/iran-blog/2015/aug/17/speculation-grows-that-iran-willing-to-swap-washington-post-reporter.

g.    On October 13, 2015, Secretary Kerry acknowledged that "it was important not to hold a nuclear agreement hostage to hostages" by tying the release of Jason and other unjustly imprisoned Americans to the nuclear negotiations.[36]

h.    On February 9, 2016, shortly after Jason's release, U.S. Director of National Intelligence James Clapper noted that Iran might "use American citizens detained when entering Iranian territories as bargaining pieces to achieve financial or political concessions in line with their strategic intentions" and referred to Jason and the other U.S. citizens freed in January 2016 when expressing concern that the IRGC would continue to detain U.S. citizens as "bargaining chips for U.S. concessions."[37]

128.   Iran has an extensive, well-documented history of taking American hostages.  On the heels of the Islamic Revolution in 1979, Iranian militants seized the American Embassy in Tehran and took 52 U.S. diplomatic and military personnel hostage.  "These hostages remained in Iranian custody for 444 days and were subjected to physical and mental torture and inhumane conditions of confinement."[38]   Like Jason and Yeganeh, those hostages were blindfolded; held in isolation; provided "minimal clothing, food, water, and medical care"; and prohibited from communicating with one another or their

---

[36] John Kerry, *Remarks with Secretary of Defense Ash Carter, Australian Foreign Minister Julie Bishop, and Australian Defense Minister Marise Payne*, U.S. Dep't of State (Oct. 13, 2015), http://www.state.gov/secretary/remarks/2015/10/248180.htm.

[37] *Worldwide Threat Assessment of the US Intelligence Community: Hearing Before the S. Armed Servs. Comm.*, 114th Cong. 24 (2016) (statement of James R. Clapper, Director of National Intelligence), http://www.armed-services.senate.gov/imo/media/doc/Clapper_02-09-16.pdf.

[38] *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 146 (D.D.C. 2002), *aff'd*, 333 F.3d 228 (D.C. Cir. 2003).

families.[39]   The hostages were subjected to repeated interrogations and threatened with physical injury as well as physical injury to their loved ones.[40]   The hostages ultimately were released after the United States agreed to unfreeze Iranian assets in the United States and terminate all legal proceedings against Iran in U.S. courts.[41]

129.   During the ensuing four decades, Iran has consistently targeted American citizens, particularly dual Iranian-American citizens, for hostage taking.   In one example that was the subject of litigation in a U.S. court, Iran kidnapped and imprisoned Nik Moradi, a dual Iranian-American citizen, in 2007.[42]   Moradi was held in solitary confinement for five and a half months and removed from his cell only for interrogations.   The prison conditions and treatment afforded Moradi were strikingly similar to those here: part of a pattern and practice of severe mistreatment and abuse.   Moradi's cell had no bed or other furniture, he had no contact with other humans except for his interrogators, and he was blindfolded whenever he was taken out of the cell.   During his detention, he was "constantly starving."[43]   Furthermore, Moradi "was repeatedly subjected to lengthy interrogations, during which he was accused of working with foreign agencies against Iran and of being a spy."[44]   During those interrogations, "he was both verbally threatened

---

[39] *Id.*

[40] *Id.*

[41] *Id.* at 147.

[42] *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 60 (D.D.C. 2015).

[43] *Id.*

[44] *Id.*

and mentally and physically abused."[45]   Moradi lost 40 to 50 pounds as a result of the mistreatment during his detention.

130.    Moradi's experience is just one example of Iran's systematic targeting of innocent Americans perceived by Iran to be valuable pawns in its relations with the United States.[46]   An expert report submitted in support of plaintiff Moradi noted that Iran has detained dual Iranian-American citizens "as part of a pattern and practice of behavior … in which illegal actions were directed against such dual citizens for political purposes of the Iranian regime.   These purposes included coercing political prisoners to make false confessions that they had taken actions against Iranian state on behalf of the American government."[47]

131.    As further evidence of hostage taking, Jason's trial proceedings frequently coincided with developments in the nuclear negotiations:

---

[45] *Id.*

[46] *See, e.g.*, *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012) ("Iran and MOIS intentionally caused the [kidnapping and torture of Reed]."); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 148 (D.D.C. 2010) (noting MOIS "had developed a particular expertise in taking and holding hostages and operating secret prisons for hostages"); *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 138 (D.D.C. 2009) ("These terrorism cases are the tragic stories of the many victims—like the more than one thousand victims represented here today—who have suffered dearly as a result of [Iran's] campaign of terror that has included hostage takings, torture, suicide bombings, and assassinations."); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 96, 97-98 (D.D.C. 2003) (noting Regier's kidnapping "'fit[] so much into th[e] pattern' of kidnappings that Iran was known to have supported" and "that the Islamic Republic of Iran and MOIS have been found responsible for acts of torture and hostage-taking in a number of cases" (second alteration in original) (quoting Dr. Patrick Clawson, an expert on Iran's politics, economics, and sponsorship of terrorism)), *abrogated on other grounds*, 353 F.3d 1024 (D.C. Cir. 2004).

[47] *Moradi*, 77 F. Supp. 3d at 64 (quoting expert report of Medhi Khalaji of the Washington Institute for Near East Policy).

a.    In July 2014, Iran and the P5+1 met for over two weeks to discuss a comprehensive nuclear agreement.  On July 19, they agreed to extend the talks through November 24.[48]  Jason and Yeganeh were arrested on July 22.

b.    On September 18, talks between Iran and the P5+1 resumed in New York City on the sidelines of the U.N. General Assembly.[49]   On November 24, the parties announced that the negotiations would be extended because progress was made and both sides saw a path forward.  Jason was charged on December 6, 2014.[50]

c.    On January 14, 2015, Jason's case was transferred to Branch 15 of the Revolutionary Courts.  On January 15, Iran and the P5+1 met in Geneva to continue negotiations.[51]

d.    Jason's trial began on May 26, 2015.  Iranian and American deputy foreign ministers met from May 27 to May 30.  Secretary Kerry and Iranian Foreign Minister Mohammad Javad Zarif met on May 30.[52]

e.    Additional trial hearings were held on June 8, July 13, and August 10, 2015.  Iran met with the P5+1 from June 3 to 4, June 10 to 14, July 7 to 9, and July 10 to 13.

---

[48] Semira N. Nikou, *Timeline of Iran's Nuclear Activities*, United States Institute of Peace: The Iran Primer, http://iranprimer.usip.org/resource/timeline-irans-nuclear-activities (last visited Sept. 22, 2016); David E. Sanger, *Negotiators Agree to Extend Iran Nuclear Talks Four More Months, Diplomats Say*, N.Y. Times (July 18, 2014), http://www.nytimes.com/2014/07/19/world/middleeast/negotiators-agree-to-extend-iran-nuclear-talks-diplomats-say.html;   Joby Warrick & Swati Sharma, *The Ordeal of Post Reporter Jason Rezaian*, Wash. Post (Jan. 16, 2016),   https://www.washingtonpost.com/world/the-washington-posts-jason-rezaian-has-now-spent-a-full-year-in-an-iranian-jail/2015/07/21/811bb46e-2cd7-11e5-bd33-395c05608059_story.html.

[49] Nikou, *supra* note 48.

[50] *Id.*; Warrick & Sharma, *supra* note 48.

[51] Warrick & Sharma, *supra* note 48; Nikou, *supra* note 48.

[52] Warrick & Sharma, *supra* note 48; Nikou, *supra* note 48.

And on July 8 and July 11, the deadline to reach an agreement was extended as negotiations continued.  They announced a comprehensive deal on July 14.  On August 15, the International Atomic Energy Agency ("IAEA") confirmed that Iran submitted documents answering the agency's questions about past activities that could be related to nuclear weapons development.[53]

f.    On July 19, the Obama Administration sent the nuclear deal to Congress to begin its sixty-day review period.  On July 20, the U.N. Security Council approved a legally binding resolution endorsing the nuclear deal and providing the basis for lifting the international economic sanctions against Iran.  That same day, Revolutionary Court officials told Ms. Ahsan that Jason's next court session would "almost certainly" be his last.[54]

g.    On October 10, Iran's parliament approved a preliminary bill supporting the nuclear deal.  On October 11, Iranian news media reported that a final verdict had been reached in Jason's case.  On October 12, Iranian news media reported that Jason had been convicted.  On October 13, Iran's parliament approved a detailed bill supporting the nuclear deal.[55]

---

[53] Arms Control Ass'n, *supra* note 8; Warrick & Sharma, *supra* note 48; Nikou, *supra* note 48;  Kate Lyons, *Iran Nuclear Talks: Timeline*, The Guardian (July 14, 2015), https://www.theguardian.com/world/2015/apr/02/iran-nuclear-talks-timeline.

[54] Arms Control Ass'n, *supra* note 8; Warrick & Sharma, *supra* note 48.

[55] Arms Control Ass'n, *supra* note 8; Brian Stelter, *The Long Ordeal of Jason Rezaian: American Journalist Jailed by Iran*, CNN Money (Oct. 11, 2015; updated Jan. 16, 2016), http://money.cnn.com/2015/10/11/media/timeline-jason-rezaian-in-prison/.

h.  On November 18, the IAEA reported that Iran was progressing toward meeting its obligations under the agreement.  On November 22, Jason was sentenced.[56]

i.  On January 16, 2016, the IAEA verified that Iran met its nuclear deal obligations. Iranian Foreign Minister Zarif announced implementation day, which triggered the lifting of sanctions against Iran and the release of approximately $100 billion of previously frozen Iranian assets.  Jason, the three other American prisoners, and the seven Iranian prisoners were released in a prisoner exchange the same day.[57]  At the same time, the United States also paid to Iran roughly $1.7 billion in cash for the settlement of a longstanding Iranian property claim.

## X.  INJURIES TO PLAINTIFFS

### A.  Injuries To Jason

132.  Jason's unlawful arrest and subsequent detention have caused severe and enduring physical, psychological, and emotional injuries.

a.  Jason was deprived of critical medical care throughout his detention, causing him to develop respiratory, ocular, and urinary tract infections.  On information and belief, Jason spent his entire period of detention in and around exposed asbestos, mold, and other environmental toxins.  He suffered from malnutrition and lost approximately 50 pounds.  Jason continues to be affected by these physical injuries and has required continuing medical care since his release.

b.  Throughout his detention, Jason was held without cause in solitary confinement for extended periods of time, causing him psychological distress and mental

---

[56] Nikou, *supra* note 48; Stelter, *supra* note 55.

[57] Arms Control Ass'n, *supra* note 8; Warrick & Sharma, *supra* note 48.

psychosis.  While in solitary, Jason was confined to a cramped and filthy cell with no human interaction for more than 22 hours per day.  A light was shone on him constantly and a loud fan was used to prevent sleep.  This extreme isolation coupled with brutal conditions and relentless interrogation caused Jason to hallucinate and suffer excruciating mental disturbances, including imagining that the walls were moving and talking.  During his time in solitary confinement, Jason believed he was losing his mind.

c.       During and after his experience in solitary confinement, Jason suffered severe depression and emotional anguish resulting from his unlawful detention. Believing he had no hope of a fair trial and would never leave Evin Prison alive, he contemplated suicide.  Jason also agonized over Iran's unlawful arrest and confinement of Yeganeh.  He worried constantly for his wife's health and safety. Jason wrote Iranian officials requesting treatment for his depression, fear, anxiety, and night terrors.  His pleas were ignored and no medical care was provided for his psychological distress.

d.       Jason continues to suffer from anxiety, depression, sleeplessness, lack of focus, short-term memory loss, and other symptoms associated with post-traumatic stress disorder.  To help address these conditions, he sees a psychologist who specializes in treating returning hostages and post-traumatic stress disorder.

e.       These conditions adversely affect Jason's ability to lead a normal life.  He often suffers from anxiety attacks when in large crowds and noisy locations.  These episodes cause Jason great embarrassment and have forced him to turn down

personal and professional opportunities that would require his presence in crowded environments.

f.   Defendants' arrest and imprisonment of Jason and Yeganeh has permanently affected Jason's relationship with his wife.  Both Jason and Yeganeh suffer from feelings of guilt as a result of what the other has suffered and the pain caused to their extended families.  Jason constantly fears for his safety and for the safety of his wife.

g.   Jason's imprisonment also has disrupted his relationships with his mother, his brother, and his extended family and friends.  He has grown more detached and fears this impact to be permanent.

133.   Jason also suffered direct financial loss as a result of his and Yeganeh's unlawful arrest and detention.  He is unable to return to Iran and has incurred significant expenses, including the loss of rent, property, and deposits, as a result.

134.   Jason dedicated a decade of his life to becoming a world-renowned expert on Iranian affairs.  As a dual-national journalist, he was uniquely positioned to report from Iran, and on Iran, with sensitivity to Western interests.  Because of Defendants' actions against Jason and the Rezaian family, he is incapable of returning to Iran and thus is no longer able to report from Iran on Iranian culture or politics.  Defendants have effectively stripped Jason of much of his livelihood.

**B.   Injuries To Mary**

135.   Iran's imprisonment of Jason caused his mother Mary to be deprived of the services, society, guidance, solatium, and consortium of Jason, and to suffer extreme mental anguish and emotional pain and suffering.

136.    Mary witnessed her son languish in Evin Prison for months on end.  She suffered the pain, anguish, and anxiety of a mother who feared that her son and his wife would not survive.  She lived with the terror of knowing that her son was being held in unthinkable conditions and that he might be tortured to death, executed, or held forever in Evin Prison.

137.    She felt compelled to relocate to Tehran amidst widespread hostility and baseless allegations that Jason was a "spy" who had committed serious crimes against the Iranian regime.  She worried constantly for his health, safety, and emotional well-being.  She agonized over the physical and emotional suffering of her daughter-in-law, and empathized with her eldest son who sacrificed so much to save his brother.

138.    Mary also suffered personal abuse at the hands of the IRGC, particularly in response to Ali's presentation to the U.N. General Assembly.  Shortly after Ali's presentation, IRGC agents detained Mary inside a car for an extended period of time, placing her in fear that she would be harmed or detained.

139.    Today, Mary suffers from ongoing anxiety regarding the physical and emotional well-being of her children and, in particular, their ability to sustain healthy and meaningful relationships with one another, given the trauma each has endured.  She fears that Iran's crimes may have forever traumatized her sons and their families, and without long-term trauma therapy, may have irreversibly altered their relationships with their respective spouses and with one another.

140.    Mary also suffers from the damaging consequences of the destructive actions perpetrated by Defendants, particularly her fear of the ongoing threat of IRGC actions against family and friends living in Iran.  Mary's ties to Iran extend back more than fifty years.  Her late

husband, Jason's and Ali's father, came from a very large and close family, many of whom live in Iran.  Throughout the decades of her marriage, Mary traveled frequently to Iran, becoming an integral member of the loving Rezaian family.  Three of her sisters-in-law live in Iran with their families, as do an aged uncle and three generations of cousins. Mary will never feel safe visiting Iran and will consequently be permanently separated from many of her loved ones.  She fears even minimal contact, worried that emails or phone calls could jeopardize her family members remaining in Iran.  The grief associated with being closed off from loved ones, and the possibility that harm could still come to family and friends in Iran, has made it impossible for her to fully embrace her son's release.

### C.     Injuries To Ali

141.   Iran's imprisonment of Jason has caused Ali to be deprived of the services, society, guidance, solatium, and consortium of his younger brother Jason, and to suffer extreme mental anguish and emotional pain and suffering.

142.   Ali, who previously had no political or media experience, and deliberately eschewed politics and Iranian issues all his life, was thrust into the epicenter of a complex, high-stress political situation in which he was the sole family member capable of taking the lead in fighting for his brother's release.  He had to make frequent, high-stakes judgment calls about which information (gleaned from Yeganeh and others in Iran) to share publicly, which to disregard, and how to develop diplomatic and media strategies, all of which caused extreme uncertainty and psychological stress.  He suffered tremendous guilt, feeling that each day his brother spent in Evin Prison was a personal failure.

143.    Ali devoted nearly all of the 544 days of his brother's detention to advocacy on his

brother's behalf.  He set aside his career and spent in excess of $100,000 in pursuit of his

brother's freedom.  His professional progress, relationships, and ability to earn an income

have suffered as a result.   His focus on securing Jason's release has also taken an

enormous toll on his family and personal life, severely straining his relationships,

including with his wife and young son, as he frequently traveled to the East Coast and

abroad in pursuit of his brother's release.

144.    Ali suffered a significant decline in his physical and mental health as a result of Jason's

imprisonment.  With the knowledge that his brother was being abused in Evin Prison and

might not survive, Ali suffered severe psychological distress, which caused him serious

health problems.   Ali became clinically depressed, paranoid, and contemplated suicide,

feeling desperate to draw greater attention to Jason's plight.  During and after the period

of Jason's incarceration, Ali suffered from panic attacks, sleep deprivation, anxiety, loss

of concentration, stress, and high blood pressure, and many of these symptoms have not

abated.  They did and continue to affect his ability to work.  Ali is seeing a therapist, a

psychiatrist, and undergoing physical therapy to treat the lasting psychological and

physical injuries caused by Defendants' actions.

## COUNT ONE

### PERSONAL INJURY CAUSED BY HOSTAGE TAKING (JASON)

145.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

146.    The FSIA confers jurisdiction on the courts and creates an independent federal cause of

action to recover for injuries sustained as a result of terrorist acts, such as hostage taking

or torture.  Under the statute, Plaintiffs must prove that (1) there was an act of "hostage

taking" or "torture"; (2) the act was committed by the foreign state or "an official, employee, or agent of such foreign state"; (3) the act "caused" (4) "personal injury or death" (5) "for which the courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. § 1605A(a)(1) & (c); *accord Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 10-11 (D.D.C. 2010).

147.   Seizing an individual in an effort to extract concessions from the United States and others is hostage taking within the definition of the FSIA.  *E.g.*, *Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 67-69, 74 (D.D.C. 2008); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 25 (D.D.C. 2001).  A plaintiff need not show that the hostage taker actually extracted such concessions, or even that it communicated its intent to the United States, *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 357 (D.C. Cir. 2006), although in this case Defendants did both.

148.   Jason was seized by Defendants on July 22, 2014, when unidentified agents of Defendants entered the home he shared with his wife and held him at gunpoint while they ransacked their home.  He was detained for 544 days, from July 22, 2014, until January 16, 2016, in Evin Prison, a facility notorious for its brutal mistreatment of political prisoners and other individuals imprisoned without due process.  He spent nearly 60 days in Evin Prison before being made aware of the alleged reasons for his detention.  Jason was not allowed access to counsel during this time, much of which he spent in solitary confinement.

149.   There is significant and compelling evidence that Jason was seized in an attempt to extract concessions from the United States:

a.     Throughout his detention, Defendants and their agents made numerous statements indicating that Jason had been seized for the purpose of compelling the United States to release lawfully detained prisoners and to make other concessions.  *See supra* ¶ 124.

b.     The purported legal proceedings to which Jason was subject were a complete sham created only for pretextual purposes.  Jason was not afforded due process of law.  He had no meaningful ability to defend himself from the baseless charges brought by Defendants, who presented no evidence showing that Jason had engaged in any illegal activities.  The wholesale lack of evidence against Jason confirms that he was detained because of his unique status as a dual citizen and a journalist for one of the most well-respected newspapers in the world.  Jason was routinely used by the Iranian Government as political leverage in its negotiations with the United States and other powers in the P5+1.

c.     International experts on Iran additionally have concluded that Jason was seized for the purpose of exerting influence over the nuclear negotiations between Iran and the P5+1 and for the purpose of compelling moderate factions within Iran to temper their support for nuclear negotiations.  *See supra* ¶ 125.

d.     Jason was arrested four days after Iran and the P5+1 agreed to extend nuclear negotiations.  Key events during Jason's detention coincided with key events during these negotiations.  The timing of several aspects of Jason's trial departed dramatically from the otherwise required course of proceedings in Iranian courts, demonstrating that the trial calendar was influenced by external considerations. *See supra* ¶ 131.

e.      On information and belief, negotiations over the release of hostages held by Iran, including Jason, occurred in tandem with the nuclear negotiations.  Although the U.S. Government sought to separate the hostage negotiations from the nuclear negotiations, government officials—including Members of Congress—insisted that the negotiations were or should be linked.  Most importantly, Defendants, the hostage takers, sought and intended to link the two and then succeeded in doing so.

f.      Jason was released from illegal detention (along with several other American citizens who had been held without justification by Iran) only after the United States agreed to release lawfully imprisoned Iranians held by the United States. *See supra* ¶¶ 120.  He was released the day the nuclear agreement went into effect, pursuant to which sanctions were lifted and the United States and Europe unfroze Iran $100 billion dollars in assets.  The same day, a longstanding property dispute between Iran and the United States was resolved, with more than $1.7 billion sent in cash to Iran.  *See supra* ¶¶ 125-126.

150.    Jason's prolonged detention resulted in physical injuries, including respiratory, ocular, and urinary tract infections.  He was denied necessary medical care and medication.  When he was finally provided with medication, it was of unknown type and dosage.  During his detention, he may have been exposed to asbestos, mold, and other environmental toxins, with unknown health effects.  The full measure of Jason's physical injuries is likely not yet apparent.

151.    Jason suffered and continues to suffer from acute psychological and emotional injury and other pain and suffering as a direct result of his detention and abuse—including solitary

confinement, lack of medical care, inadequate nutrition, relentless interrogations, physical distress, intimidation and disorientation, and denial of due process.  While in prison, Jason experienced depression, hallucinations, and suicidal ideations.  Since his release, he has had trouble sleeping and has experienced issues with concentration as well as other symptoms of post-traumatic stress disorder.  His relationships with his family have been permanently compromised by his experiences during his unjust and illegal imprisonment.

152.   Jason's detention has resulted and will continue to result in economic injury.  At the time of his arrest, Jason served as the *Post*'s sole correspondent in Iran, a position he earned by developing an extensive network in Iran and a reputation as a fair and talented journalist.  His unlawful detention resulted in reputational harm, loss of his network, loss of his credentials, and loss of general access to Iran.  Thus, as a result of Defendants' actions, Jason can no longer pursue his passion—reporting from Iran on Iranian culture and politics.  He is unable to even return to Iran, a country he loved and about which he had developed specific and marketable expertise, and where he had intended to live and raise a family with his Iranian wife, Yeganeh.  Moreover, the physical and psychological injuries he experienced will require medical and psychological treatment, potentially for the rest of his life.

## COUNT TWO

### PERSONAL INJURY CAUSED BY TORTURE (JASON)

153.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

154.   Under the terrorism exception to the FSIA, torture is defined to "have the meaning given … in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note)."  28

.

U.S.C. § 1605A(h)(7). The Torture Victim Protection Act defines torture as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992), *codified at* 28 U.S.C. § 1350 (note).

155. Jason was in the custody or control of Defendants from July 22, 2014, until January 16, 2016. During those 544 days, Jason was relentlessly interrogated. He was subjected to constant threats, including threats of death and dismemberment. In addition to threatening Jason, his captors threatened to murder or dismember his wife, who also was detained in Evin Prison.

156. Jason was subjected to grueling, full-day interrogation sessions involving severe physical and psychological strain. He was intimidated, disoriented, blindfolded, and transported around the prison; denied access to counsel; denied visitation by both foreign government representatives and family members; and physically threatened, psychologically abused, and faced with threats to the safety and security of his wife and others.

157. Jason was provided inadequate nutrition and denied access to appropriate medical care or sanitary facilities. This deprivation of basic care caused Jason to develop respiratory, ocular, and urinary tract infections as well as to lose over 50 pounds during his detention.

158.   For nearly 40 days, Jason was held in solitary confinement in a filthy cell with no bed and permitted no human interaction for over 22 hours per day.  The only human contact Jason was allowed was with prison guards or his interrogators.  Defendants illuminated his room 24 hours a day to prevent Jason from sleeping.  The extreme isolation and deplorable living conditions caused Jason emotional and psychological anguish, extreme distress, and prolonged pain and suffering.

159.   Defendants' mistreatment of Jason constitutes torture within the meaning of the FSIA. *See Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 152 (D.D.C. 2010) (finding hostage experienced torture in the form of "beatings, unsanitary conditions, inadequate food and medical care, and mock executions"); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 91-92, 97 (D.D.C. 2003) (finding victim "tortured" when captors threatened him with death, confined him in "deplorable and inhumane conditions" for 65 days, fed him a monotonous and inadequate diet causing him to lose over 50 pounds, and subjected him to psychological torment, such as falsely telling him "that he was about to be released"), *abrogated on other grounds*, 353 F.3d 1024 (D.C. Cir. 2004); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 32 (D.D.C. 2001) (finding "deprivation of adequate food, light, toilet facilities, and medical care for 564 days amounts to torture"); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 45 (D.D.C. 2001) (finding long-term imprisonment and "deprivation of adequate food, light, toilet facilities, and medical care" constituted torture).

160.   Defendants' torture of Jason resulted in physical injury, including that caused by untreated or poorly treated medical conditions.

161.   Defendants' torture of Jason resulted in severe psychological and emotional injuries, including symptoms of post-traumatic stress disorder, major depression, and suicidal ideation.

## COUNT THREE

### ASSAULT (JASON)

162.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

163.   "An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension."  Restatement (Second) of Torts § 21 (Am. Law Inst. 1965).

164.   Hostage taking and torture under the FSIA constitute assault because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm."  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010).

165.   Jason was held hostage and tortured by Defendants, resulting in harmful contact and an imminent apprehension of such harmful contact.

166.   While in Defendants' custody, Jason was frequently threatened with harmful and offensive physical contact, including death and dismemberment.  These threats caused Jason to experience imminent apprehension that he could be killed, tortured, abused, or otherwise physically and emotionally injured.  He constantly feared for his health and safety.

## COUNT FOUR

### BATTERY (JASON)

167.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

168. "An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results."  Restatement (Second) of Torts § 13 (Am. Law Inst. 1965).   "Harmful contact is that which results in 'any physical impairment of the condition of another's body, or physical pain or illness.'"  *Valore*, 700 F. Supp. at 77 (quoting Restatement (Second) of Torts § 13).

169. Hostage taking and torture under the FSIA constitute battery because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of [such] harm."  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 400 (D.D.C. 2015) (noting that Plaintiff was killed by a bombing and thus met with "harmful contact") (internal quotation omitted).

170. Jason was held hostage and tortured by Defendants, resulting in harmful contact and fear of such harmful contact.

171. While in Defendants' custody, Jason was routinely subjected to harmful and offensive contact, including being forcibly moved at gunpoint, being forced to wear a blindfold, and being forced to take unidentified medication without the supervision of medical professionals.

## COUNT FIVE

### FALSE IMPRISONMENT (JASON)

172. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

173. "(1) An actor is subject to liability to another for false imprisonment if (a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and

(b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it."  Restatement (Second) of Torts § 35.

174.   The unlawful arrest and imprisonment of U.S. citizens by Defendants constitutes false imprisonment.  *See, e.g.*, *Jenco*, 154 F. Supp. 2d at 34; *Sutherland*, 151 F. Supp. 2d at 49.

175.   From July 22, 2014, until January 16, 2016, Defendants unlawfully detained Jason in Evin Prison, an institution that is known in Iran and internationally for its brutal mistreatment of hostages, political prisoners, and human rights defenders.  Jason was aware of this illegal detention.  Jason has suffered and continues to suffer physical, economic, emotional, and psychological harm as a result of this illegal detention.

## COUNT SIX

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (JASON)

176.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

177.   "An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm and, if the emotional harm causes bodily harm, also for the bodily harm."  Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 46 (Am. Law Inst. 2012); *accord Valencia*, 774 F. Supp. 2d at 14; *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 28 (D.D.C. 2008).

178.   "All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress."  *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009) (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).  Acts of terrorism under the FSIA—such as

hostage taking and torture—are therefore "sufficiently outrageous and intended to inflict severe emotional harm" to impose liability on defendants. *Thuneibat v. Syrian Arab Republic*, No. 12-cv-00020, 2016 WL 829870, at *10 (D.D.C. Mar. 1, 2016) (quoting *Heiser*, 659 F. Supp. 2d at 27).

179.  By establishing that he was taken hostage or tortured by Defendants and that emotional distress resulted, Jason has established his right to recovery for intentional infliction of emotional distress. *See Roth*, 78 F. Supp. 3d at 400-401; *Valencia*, 774 F. Supp. 2d at 14.

180.  Defendants' conduct in holding Jason hostage and inflicting torture upon him caused Jason to suffer severe emotional harm, including depression, suicidal ideation, symptoms of post-traumatic stress disorder, and irreparable harm to his relationships with his wife, mother, brother, and other friends and family.

## COUNT SEVEN

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/SOLATIUM (JASON)

181.  Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

182.  Yeganeh was held hostage for 72 days.  Yeganeh's arrest and confinement—which sought to compel the United States, the P5+1, and moderate factions within Iran to do or abstain from doing an act as an explicit or implicit condition for Jason's release, and also sought to compel his cooperation—satisfy the definition of hostage taking under the FSIA.

183.  During Yeganeh's confinement, she was relentlessly interrogated, threatened with physical violence and death, subjected to psychological torment, held in solitary confinement, and deprived of food and necessary medical care.  Those acts, which

inflicted severe physical and mental pain and suffering, satisfy the definition of torture under the FSIA.

184.   Defendants' conduct in holding Yeganeh hostage and inflicting torture upon her caused Jason to suffer severe emotional harm, including persistent feelings of guilt that have adversely altered his marital relationship.

## COUNT EIGHT

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/SOLATIUM (MARY, ALI)

185.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

186.   "An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm and, if the emotional harm causes bodily harm, also for the bodily harm."  Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 46; *accord Valencia*, 774 F. Supp. 2d at 14; *Acosta*, 574 F. Supp. 2d at 28.

187.   When a defendant's conduct is directed at a third person, the Restatement generally requires that a plaintiff be a "close family member" and have "contemporaneously perceive[d] the event."  Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 46 cmt. m; *accord Valencia*, 774 F. Supp. 2d at 14.

188.   "All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience." *Heiser*, 659 F. Supp. 2d at 27 (quoting *Stethem*, 201 F. Supp. 2d at 89).

189.   Because Jason was taken hostage and tortured, Plaintiffs need only demonstrate that they are close family members, and that emotional distress did result, in order to state a valid

theory of recovery for intentional infliction of emotional distress.  *See Roth*, 78 F. Supp. 3d at 401.

190.   Defendants' extreme and outrageous conduct in holding Jason hostage and inflicting torture upon him caused Mary (Jason's mother) and Ali (Jason's brother) to suffer from severe emotional harm, including depression, persistent feelings of guilt, loss of sleep, paranoia, loss of focus, and other symptoms of post-traumatic stress disorder, including thoughts of suicide.

## COUNT NINE

### LOSS OF PROPERTY (JASON, MARY, ALI)

191.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

192.   The FSIA allows for recovery for "reasonably foreseeable property loss … by reason of the same acts on which the action … is based."  28 U.S.C. § 1605A(d).  Section 1605A(d) "contains two causation elements: (1) the property loss must come 'by reason of' the [hostage taking or torture], and (2) the property loss must be a 'reasonably foreseeable' result of [hostage taking or torture]."  *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 57 (D.D.C. 2012).

193.   As a result of his unlawful arrest and detention, Jason is unable to return to Iran.  He has incurred significant expenses, including the loss of rent, property, and deposits, as a result.  These losses occurred "by reason of" and were a "reasonably foreseeable" result of his arrest and detention.

194.   Mary and Ali expended significant time and resources in order to secure Jason's release.  These expenses and opportunity costs occurred "by reason of" and were a "reasonably foreseeable" consequence of Defendants' hostage taking and torture of Jason.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against all Defendants and respectfully request the following relief:

195. Jason is entitled to compensatory damages for personal injury, assault, battery, and unjust imprisonment suffered as a result of hostage taking and torture.

196. Jason is entitled to solatium damages for Yeganeh's detention (under 28 U.S.C. § 1605A(c)).

197. Mary and Ali are entitled to solatium damages for Jason's detention (under 28 U.S.C. § 1605A(c)).

198. All Plaintiffs are entitled to special damages and other compensation for property loss suffered as a result of Jason's detention.

199. All Plaintiffs are entitled to consequential damages for their lost earning potential and other long-term damages.

200. All Plaintiffs are entitled to aggravated damages for Defendants' cruelty, torture, and abuse.

201. All Plaintiffs are entitled to disgorgement damages for Defendants' unlawful monetary and other benefits obtained in exchange for any hostage.

202. All Plaintiffs are otherwise entitled to general damages and all other applicable damages.

203. Punitive damages should be assessed (under 28 U.S.C. § 1605A(c)).

204. The Court should award Plaintiffs their full costs and attorneys' fees as incidental damages and as otherwise appropriate.

205. The Court should grant such further and other relief as this Court deems just and proper.

Dated:  October 3, 2016                    Respectfully submitted,


                                           */s/ David W. Bowker*
                                           David W. Bowker (DC Bar No. 989309)
                                           Robert J. McKeehan (DC Bar No. 427857)
                                           Jessica B. Leinwand (DC Bar No. 1008924)
                                           Maury Riggan (DC Bar No. 1024739)
                                           Justin Baxenberg (DC Bar No.1034258)
                                           Derek A. Woodman (DC Bar No. 1032144)
                                           Wilmer Cutler Pickering Hale and Dorr LLP
                                           1875 Pennsylvania Avenue, NW
                                           Washington, DC  20006
                                           Tel.: (202) 663-6000
                                           Fax: (202) 663-6363
                                           david.bowker@wilmerhale.com
                                           robert.mckeehan@wilmerhale.com
                                           jessica.leinwand@wilmerhale.com
                                           maury.riggan@wilmerhale.com
                                           justin.baxenberg@wilmerhale.com
                                           derek.woodman@wilmerhale.com

                                           *Counsel for Plaintiffs*