# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JASON REZAIAN, _et al._,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Case No. 16-1960 (RJL)** |
| | ) | |
| **ISLAMIC REPUBLIC OF IRAN, _et al._,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM OPINION**

(November **21**, 2019)  [Dkt. ## 19, 28]

**FILED**

**NOV 2 2 2019**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

On July 22, 2014, plaintiff Jason Rezaian ("Jason"[1]), a dual national of the United States and Iran, was living in Iran and working as the Tehran correspondent for the Washington _Post_. That evening, as he left his apartment to attend his mother-in-law's birthday party, Jason was arrested at gunpoint. He was held in Iranian custody for the next 544 days.

During the almost year-and-a-half long detention, Jason was physically and psychologically abused. He was deprived of sleep. He was denied medical care. He was interrogated, threatened with execution, and charged with espionage. Iran finally released Jason, along with three other Americans, on January 16, 2016, after the United States Government granted clemency to several Iranians convicted of sanctions violations and

---

[1] All three plaintiffs in this suit share the same surname. This Memorandum Opinion uses given names to refer to individual plaintiffs for the sake of clarity.

agreed to pay Iran approximately $1.7 billion.

Alleging that his detention amounted to hostage taking and torture, Jason, with his brother, Ali Rezaian ("Ali"), and mother, Mary Rezaian ("Mary") (collectively, "plaintiffs" or "the Rezaians") sued the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps (collectively, "Iran") under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq*. Iran has not appeared to defend its conduct, so the Rezaians filed a Motion for Default Judgment [Dkt. # 19]. For the reasons that follow, their motion must be GRANTED.

## FINDINGS OF FACT

Based on the testimony and documentary evidence comprising the record in this case, the Court makes the following findings of fact.

Jason Rezaian was born in San Francisco, California, in 1976. *See* Hr'g Tr. 22:14– 16. He is a United States citizen by birth. *See id.* And because his father was an Iranian citizen who emigrated to the United States, Jason is also a citizen of Iran. *See id.* at 23:6– 14, 95:18–24.

Jason has been working as a journalist since the mid-2000s, and his dual-national status placed him a unique position within the industry. *See* Hr'g Tr. 27:20–28:13. Iranian citizenship gave Jason access to connections and press credentials in Iran that were out of many American journalists' reach. *See id.* At the same time, Jason, who grew up in the United States, could write for and connect with American audiences. *See id.* at 26:14–19. In 2009, after freelancing for a time from the United States, Jason decided to move to

2

Tehran and work full-time as a journalist covering Iran. *See id.* at 27:20–28:13.

Initially, the move went well. In Iran, Jason "work[ed] very consistently from 2009 until 2012 when [he] was offered [a] job at the *The Washington Post*." Hr'g Tr. 28:11–13. The job offer caused his "stock rose exponentially." *Id.* at 28:20–22. Working for the Post came with "a better income, more stability, more opportunities"—including opportunities to appear on television—"and more respect, generally, within the community of officialdom and business inside Iran." *Id.* at 28:23–25; 30:4–20. By July 2014, Jason was a successful, visible American journalist, reporting from inside Iran.

At 8:00 pm, on July 22, 2014, Jason and his wife, Yeganeh Salehi ("Yeganeh"), left their apartment and took an elevator downstairs to catch a taxi. *See* Hr'g Tr. 34:20–35:20. They were headed to a birthday party for Yeganeh's mother—but they never made it. *See id.* When the elevator reached the building's garage, the doors opened to three masked men. *See id.* at 35:10–13; 36:3–4. One was pointing a gun at Jason. *See id.* The gunman confirmed Jason's identity, forced his way onto the elevator, and brought the couple back to their apartment. *See id.* After gaining entry to the apartment, the men "ransack[ed] the entire property." *Id.* at 35:10–20.

Soon, a team of more than a dozen agents, all wearing surgical masks over their faces, arrived at the apartment. *See* Hr'g Tr. 36:1–4. They confiscated Jason's and Yeganeh's identifying documents—including their passports—and electronics. *See id.* at 36:2–21. They demanded passwords to social media and email accounts. *See id.* When they were done going through the apartment, the agents led Jason and Yeganeh to a van,

3

handcuffed and blindfolded them, and drove to Evin Prison. *See id.* at 37:20–38:14; 87:10–20. There, both were detained by Iran's Revolutionary Guard. *See id.* at 37:20–38:14; 87:10–20.

At Evin Prison, Jason was accused of espionage. *See* Hr'g Tr. 38:15–24. His captors told him he would face execution if he did not confess to the charge, and then "deposited [him] in solitary confinement" for the next 49 days. *See id.* at 39:10–24. While in solitary confinement, Jason was held in an eight foot by four foot cell. *See* Hr'g Tr. 40:5–6. The cell had no furniture, save for a piece of carpeting and two rough blankets. *See id.* at 40:20–41:3. The lights were kept on twenty-four hours a day. *See id.* at 40:18–19. And the food was sparse enough that Jason lost forty pounds during the first forty days he was confined. *See id.* at 43:6–21.

This treatment took a considerable mental and physical toll. Jason "quickly . . . bec[a]me disjointed from reality." Hr'g Tr. 42:2. He cycled through feelings of "hysteria," "confusion," and "depression." *Id.* at 42:2–22. He developed infections in his eyes and elsewhere. *See id.* at 44:12–14. His captors failed to give him blood pressure medication that he had been prescribed since high school. *See id.* at 44:3–11. And he developed pulmonary and respiratory issues that have never since abated. *See id.* at 44:16–22.

For a while, Jason was interrogated on a near daily basis. *See* Hr'g Tr. 44:23–45:10. The frequency later tapered off. *See id.* But his interrogations remained harrowing throughout his detention. Jason was routinely threatened with execution. *See id.* at 45:13–

4

15. He "was told that if [he] didn't answer certain questions in certain ways, limbs would be cut off." *Id.* at 45:16–18. After being removed from solitary confinement, Jason's captors threatened him with return. *See id.* at 45:19–21. And his interrogators also threatened harm to his wife, who, as Jason well knew, had been arrested alongside him. *See id.* at 46:4–10.

Eventually, worn down, Jason relented and gave a forced confession. *See* Hr'g Tr. 46:11–19. He had not, of course, committed any acts of espionage. *See id.* But Jason's captors told him that providing a videotaped confession was his only chance of ever being released. *See id.* So he did as he was told. *See id.*

From time to time, Jason's captors brought him to an Iranian court. The appearances were ostensibly to try him on the espionage charges. *See* Hr'g Tr. 47:2–25. But the proceedings were largely for show. The only legal representation Jason ever received was from a court-appointed attorney who did not meet with him outside the presence of the judge. *Id.* 47:12–16; 48:1–19. Jason was not given advance notice of any court date. *See id.* And he was not allowed to present defenses to the court. *See id.* at 48:20–22. In fact, no side presented any witness, or any other evidence, for or against him. *See id.* at 49:14–50:20. Despite the absence of evidence, the judge overseeing Jason's case made "very clear that[] [Jason was] a spy for the United States of America," and that he intended to "'sentenc[e] [Jason] to death.'" *Id.* at 49:2–5 (quotation marks omitted).

In the end, however, no verdict was ever rendered. *See* Hr'g Tr. at 50:21–51:14. Instead, in January 2016, Jason learned "that [he] would be released in a swap in exchange

for several Iranian nationals being held in U.S. prisons." *Id.* at 52:19–22; 85:14–18. This did not come as a complete surprise. Throughout the detention, Jason's captors had repeatedly told him, "you will be released when America gives us what we want." *Id.* at 51:21–52:1.

Prior to the actual release, Jason was, again, forced to give a videotaped statement. *See* Hr'g Tr. 79:16–80:22. This time, his captors attempted to elicit compliments about the conditions of his confinement and apologies for mistakes Jason had ostensibly made. *See id.* Jason also had to sign a letter requesting a pardon from Iran's supreme leader. *See id.* After doing so, he was given clothes and a perfunctory physical examination, and then taken to an airport. *See id.* at 83:2–84:20. Jason arrived at the airport on January 16th, 2016—544 days after his arrest. *See id.* at 85:14–18.

The Iranian Revolutionary Guard agents who transported Jason from prison to the airport told him him that his wife and mother would not be permitted to leave Iran with him. *See* Hr'g Tr. 83:21–82:22. This created one last hurdle for Jason to clear before leaving. Yeganeh's passport had been taken when she was arrested, and Iran's legal case against her remained pending. *See id.* at 84:2–6. If Yeganeh was not permitted to leave with Jason, it was not clear that she would ever make it out of Iran. *See id.* Jason resisted the Iranian agents' attempts to get him to board a plane without his wife and mother. *See id.* at 84:25–85:13. And finally, more than twelve hours after he left prison, Jason was reunited with both Yeganeh and Mary. *See id.* at 85:14–86:15.

All three boarded a Swiss ministerial plane and left Iran together. Hr'g Tr. 85:14–

6

86:15. They flew to Switzerland, and then to Landstuhl, Germany, where Jason was taken to a military hospital and treated by a team of psychologists trained to deal with returning captives. *See id.* at 88:14–89:15.

While Jason's flight to Switzerland marked the end of his detention, the physical and mental effects of the imprisonment remain ongoing. Jason developed back problems from the sleeping conditions in Evin Prison. *See* Hr'g Tr. 220:11–222:20. He developed breathing problems from the air quality. *See id.* And neither have subsided. *See id.* While in prison, Jason experienced pain in his testicles that was never adequately treated and now may affect his ability to conceive children. *See id.* Jason continues to feel shame and guilt because of the experience. *See id.* at 221:17–21. He has trouble sleeping, and sometimes wakes up screaming due to nightmares. *See id.* at 224:5–13. He has severe anxiety associated with travel, and he has psoriasis brought on by stress. *See id.* at 221:22–223:20.

Jason's experience also irrevocably altered his relationships with family members. *See* Hr'g Tr. 224:14–228:21. Yeganeh can no longer return to the country where she grew up and where her parents still live. *See id.* Mary and Ali Rezaian had their lives upended by Jason's detention, and all must now live with the memories of the turbulent time period. *See id.*

Ali, for his part, put his life and career on hold to become, in essence, a full-time advocate for Jason's release. Ali was tasked with coordinating between his family, the United States Department of State, the United Nations, and the Washington *Post*, all of whom had an interest in Jason's situation in Iran. *See* Hr'g Tr. 114:12–116:10; 120:22–

122:3. In that capacity, Ali had to make strategic decisions—like the decision to publicize Jason's detention—that potentially changed the likelihood of Jason's survival. *See id.* He attended hundreds of meetings with government officials and nonprofit groups. *See id.* at 128:14–16. He petitioned the Iranian government for Jason's release. *See id.* at 116:15–117:12. And he vigilantly tracked news filtering out of Iran. *See id.*

This work "took over [Ali's] life completely for 18 months." Hr'g Tr. 234:12–16. By the time Jason was released, Ali had given somewhere between two and three hundred interviews on television. *See id.* at 128:9–13. Most prominently, he spoke at the United Nations Human Rights Council in 2015. *See id.* at 120:22–122:3. Following that speech, Iranian news outlets published pictures of Ali and accused him of being a spy. *See id.* at 122:4–124:6. From then on, Ali had to worry about retaliation from Iran in addition to all of the other interests he was balancing. *See id.* at 127:3–17. And in fact, Iran did interrogate both his mother and Yeganeh about Ali's speeches and statements to the press. *See id.* at 127:18–128:8.

Much of Ali's campaign was funded out of pocket. He spent approximately $300,000 of his own money on flights, hotel rooms, communications, legal expenses, and payments to an employee of his consulting company, who he enlisted assist his efforts. *See* Hr'g Tr. 129:21–135:1. Ali also lost business opportunities due to his focus on freeing Jason. *See id.* at 135:4–136:7. His consulting firm shed clients and declined engagements because Ali's time was consumed by advocacy for Jason. *See id.*

Like Jason, Ali continues to experience ongoing psychological effects from the

ordeal. Ali became "very depressed" during his campaign to free Jason, considering, at one point, whether killing himself would increase the pressure on Iran to release his brother. Hr'g Tr. 234:12–16; 235:16–236:14. He continues to experience feelings of paranoia, and the year and a half spent prioritizing Jason over his wife and children damaged Ali's relationship with his immediate family. *See id.* at 236:15–237:9. Ali now sees both a therapist and psychopharmacologist to help him deal with these issues. *See id.* at 239:22–240:2.

Mary Rezaian also uprooted her life upon learning of Jason's detention. After living with Jason in Iran for parts of 2011 and 2012, Mary moved to Istanbul, Turkey, when Jason and Yeganeh got married. *See* Hr'g Tr. 141:10–143:12. She built a life there, taking a job teaching English at a language institute. *See id.* at 144:6–15. But after Jason's arrest, Mary quit her job to make frequent trips to Tehran, where she could help her imprisoned son. *See id.* at 151:20–25; 165:1–4.

In Iran, Mary met with Revolutionary Guard agents on multiple occasions to discuss Jason. *See* Hr'g Tr. 152:15–155:25. The agents made clear that they controlled access to Jason. *See id.* They were, for example, able to arrange visitations. *See id.* And the agents made clear what the Revolutionary Guard hoped to gain from Jason's detention: They expressly sought Mary's "help in contacting either Secretary Kerry or Mrs. Kerry or Wendy Sherman to see about making the trade for Jason." *Id.*

Mary could not, of course, broker a deal on behalf of the United States government. *See* Hr'g Tr. 155:16–157:23. She was left, therefore, to wait out Jason's detention as he

9

was tried for espionage—in proceedings Mary was not permitted to attend—and as the Revolutionary Guard tried to intimidate her and Yeganeh. *See id.* at 159:6–160:7; 162:4–163:7. Mary did just that, while suffering the attendant emotional distress, until January 16, 2016, when she and her son were finally able leave Iran together. *See id.* at 85:14–18.

## PROCEDURAL HISTORY

The Rezaians sued Iran on October 3, 2016, about ten months after Jason was released from Evin Prison. *See* Compl. [Dkt. # 1]. They duly served the summons and complaint through diplomatic channels. *See* Return of Service Aff. [Dkt. # 13]. But Iran never answered the complaint or otherwise appeared in this lawsuit. On February 27, 2018, after Iran's deadline to respond to the complaint had lapsed, the Rezaians filed a Motion for Default Judgment [Dkt. # 19] against Iran.

The Court held two days of evidentiary hearings on the Rezaians' motion. Each plaintiff—Jason, Ali, and Mary Rezaian—testified about their experience during and after Jason's detention. Mehdi Khalaji, an expert on Iran's domestic and foreign politics, testified about Iran's history of arresting dual-nationals for political purposes. And Stuart Grassian, a psychiatrist and expert in psychological trauma, who analyzed Jason, Ali, and Mary, testified about the effects of Jason's detention on each of them.[2]

---

[2] In addition to the hearing evidence, the Rezaians submitted declarations in support of their motion for default judgment from each witness who testified live and from Benjamin Sacks, an economist. They also filed a Motion in Limine [Dkt. # 28] requesting that the declarations be admitted as evidence in support of their Motion for Default Judgment. Consistent with the practice of other courts in this district that have held hearings in FSIA default proceedings, the Rezaians' motion is GRANTED. *See, e.g., Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 77 (D.D.C. 2017) (considering affidavits attached to a motion for default judgment, evidence submitted at a live hearing, and supplementary submissions filed after the

## STANDARD OF REVIEW

A default judgment may be entered "when the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

When default judgment is sought under the FSIA, plaintiffs must "establish[] [their] . . . right to relief by evidence satisfactory to the court" before the judgment is entered.  28 U.S.C. § 1608(e).  This requirement "imposes a duty on [the] court[] to not simply accept a complaint's unsupported allegations as true, and obligates courts to inquire further before entering judgment against parties in default." *Firebird Glob. Master Fund II Ltd. v. Republic of Nauru*, 915 F. Supp. 2d 124, 126 (D.D.C. 2013) (internal quotation marks omitted); *see* 28 U.S.C. § 1608(e).  But the Court need not "demand more or different evidence than it would ordinarily receive." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017).  And where a plaintiff invokes the FSIA's terrorism exception, as the Rezaians do here, "courts must be mindful that Congress enacted [that] exception . . . with the 'aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 74 (D.D.C. 2017) (quoting *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014)).

---

hearing, when determining whether to enter default judgment against Iran under the FSIA).

## CONLUSIONS OF LAW

The Rezaians are entitled to a default judgment against Iran if "(1) the Court has subject matter jurisdiction over the[ir] claims, (2) personal jurisdiction is properly exercised over [Iran], (3) [the Rezaians] have presented satisfactory evidence to establish their claims[,] . . . and (4) [they] have satisfactorily proven that they are entitled to the monetary damages they seek." *Braun*, 228 F. Supp. 3d at 75. The first three of these requirements are easily satisfied here. And as explained below, the Rezaians have proven their entitlement to some, but not all, of the damages they seek. Accordingly, default judgment will be entered in their favor.

### I.    Subject Matter Jurisdiction

"The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in a United States court." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 65 (D.D.C. 2015). The Rezaians argue that this Court has jurisdiction over Iran through the FSIA's "terrorism exception." *See* 28 U.S.C. § 1605A(a); *id.* § 1330(a). The terrorism exception applies when money damages are sought (1) from a "foreign country [that] was designated a state sponsor of terrorism at the time of the act," (2) by "a national of the United States," (3) after "the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim,"[3] (4) to compensate the claimant for "for personal injury or death caused by torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material

---

[3] The third requirement applies only where damages are sought for an "act [that] occurred in the foreign state against which the claim has been brought." 28 U.S.C. § 1605A(a)(2)(A)(iii). Because the Rezaians seek to hold Iran liable for acts that occurred in Iran, it applies here.

support or resources for such an act, if engaged in by an official, employee, or agent of a

foreign country." *Braun*, 228 F. Supp. 3d at 75 (quotation marks and citations omitted).

All four of these elements are satisfied here.

First, the Rezaians seek money damages from Iran. "The Islamic Republic of Iran

has been designated a state sponsor of terrorism since January 19, 1984." *Moradi*, 77 F.

Supp. 3d at 66. And it remains so designated to this day. *See* State Sponsors of Terrorism,

U.S. Dept. of State, http://www.state.gov/j/ct/list/c14151.htm.

Second, Jason, Ali, and Mary Rezaian were all born in the United States and are all

United States citizens. *See* Hr'g Tr. 22:7–16; 23:6–24:6; 95:12–24.

Third, when the Rezaians served Iran with the summons and complaint in this

matter, they included an offer to arbitrate their claims. *See* Notice of Offer to Arbitrate

[Dkt. # 3]; Return of Service Aff., [Dkt. # 13]. The offer satisfies the FSIA's requirement

that Iran be given a reasonable opportunity to arbitrate their claims. *See Moradi*, 77 F.

Supp. 3d at 66 (finding FSIA jurisdiction when "an offer of arbitration was included with

the documents served on Iran"); *cf. Simpson v. Socialist People's Libyan Arab Jamahiriya*,

326 F.3d 230, 233 (D.C. Cir. 2003) ("a reasonable opportunity to arbitrate" need not

precede the filing of the complaint).

Finally, the damages sought by the Rezaians were caused by hostage taking and

torture. "The FSIA's definition of 'hostage taking' is borrowed from Article 1 of the

International Convention Against the Taking of Hostages." *Fritz v. Islamic Republic of

Iran*, 320 F. Supp. 3d 48, 78 (D.D.C. 2018) (citing 28 U.S.C. § 1605A(h)). According to

13

that treaty, hostage taking occurs when

> [a]ny person . . . seizes or detains and threatens to kill, to injure or to continue
> to detain another person . . . in order to compel a third party, namely, a State,
> an international governmental organization, a natural or juridical person, or
> a group of persons, to do or abstain from doing any act as an explicit or
> implicit condition for the release of the hostage . . . .

International Convention Against the Taking of Hostages, art. 1, Dec. 17, 1979, 1316

U.N.T.S. 205, 207. At the hearing in this matter, Jason testified in detail how Iranian agents

seized, detained, and threatened to kill and maim him. Members of the Revolutionary

Guard explained to Mary that Iran took these actions with the intention of brokering a

prisoner trade with the United States. Taken together, these facts satisfy each element of

the Convention's definition of hostage taking. Iran seized Jason, threatened to kill Jason,

and did so with the goal of compelling the United States to free Iranian prisoners as a

condition of Jason's release.

"For the definition of 'torture,' the FSIA looks to the Torture Victim Protection Act

of 1991 ('TVPA') . . . ." *Fritz*, 320 F. Supp. 3d at 79. The TVPA provides that torture is

> any act, directed against an individual in the offender's custody or physical
> control, by which severe pain or suffering (other than pain or suffering
> arising from or inherent in, or incidental to, lawful sanctions), whether
> physical or mental, is intentionally inflicted on that individual for such
> purposes as obtaining from that individual or a third person information or a
> confession, punishing that individual for an act that individual or a third
> person has committed or is suspected of having committed, intimidating or
> coercing that individual or a third person, or for any reason based on
> discrimination of any kind.

TVPA, Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992). Iran's treatment of Jason

fits this description, too. There is no doubt that Jason experienced pain and suffering while

14

in Iran's custody.    He described squalid living conditions, solitary confinement, malnutrition, physical ailments, and tenth-rate medical care—all suffered while imprisoned by Iran's Revolutionary Guard, and all causes of both immediate and persisting pain. And there is likewise little doubt that the pain and suffering was inflicted on Jason "for [the] purpose[] [of] obtaining . . . a confession." TVPA, Pub. L. No. 102-256, 106 Stat. 73. Jason testified that his captors repeatedly sought—often by threatening additional pain and suffering—a videotaped confession to crimes that he did not commit.

To constitute torture, Jason's pain and suffering must also have been "severe." TVPA, § 3(b)(1), 106 Stat. at 73. Unfortunately, however, Courts have been given "little guidance in assessing" the severity required under the TVPA. *Fritz*, 320 F. Supp. 3d at 80. One telltale sign of torture is the imposition of suffering that "warrant[s] . . . universal condemnation." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002). Iran's conduct here, however, certainly fits that description. As I observed at the evidentiary hearing, Jason's story is, "if nothing else, . . . a living example of how brutal and how lacking in any sense of due process" Iran can be. Hr'g Tr. 232:13–18.

Moreover, former judges in this district have held conduct much like Iran's treatment of Jason is sufficiently severe to qualify as torture. In *Massie v. Government of the Democratic People's Republic of Korea*, for example, a Court held that the Democratic People's Republic of Korea tortured detainees who were "provided inadequate rations of food," "forced to live in unsanitary conditions," and subjected to "individual threats of

15

death" and "severe beatings." 592 F. Supp. 2d 57, 66, 74 (D.D.C. 2008) (Kennedy, J.). Another judge in this district concluded that a detainee was tortured when he was held at gunpoint, threatened with physical injury by interrogators, and locked "in a room with no bed, window, light, electricity, water, toilet or adequate access to sanitary facilities." *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 25 (D.D.C. 2001) (Oberdorfer, J.). Iran's treatment of Jason was similar. He was arrested at gunpoint, held in unsanitary conditions and solitary confinement, threatened with death and dismemberment by interrogators trying to elicit a confession, and provided inadequate food and medical care. Following the reasoning of my colleagues who have confronted similar facts, I conclude that Iran's treatment of Jason was sufficiently severe to be characterized as torture.

The only remaining hurdle to subject matter jurisdiction is the question whether "the injuries . . . at issue were 'caused by'" Iran's torture and hostage taking. *Fritz*, 320 F. Supp. 3d at 85. The FSIA "require[s] only a showing of 'proximate cause.'" *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004). And the proximate cause standard can be met "by showing 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 394 (D.D.C. 2015) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010)).

The Rezaians have satisfied this standard. The injuries that they allege—physical and emotional distress stemming from Jason's detention in Iran—are a direct result of Iran

torturing Jason and taking him hostage. Iran's conduct was unquestionably "a substantial factor in the sequence of events that led to" Jason's physical pain and all three Rezaians' emotional distress. *Fritz*, 320 F. Supp. 3d at 85 (quotation marks omitted). And the Rezaians' pain and emotional distress are just as unquestionably a "reasonably foreseeable [and] . . . natural consequence of Iran's conduct" here. *Id.* (quotation marks omitted). The injuries at issue in this suit were thus "caused by . . . act[s] of torture" and "hostage taking." 28 U.S.C. § 1605A(a)(1).

The Rezaians, in short, are United States nationals seeking money damages from a designated state sponsor of terrorism for injuries caused by hostage taking and torture after offering to arbitrate the dispute. For those reasons, they have established that this Court has jurisdiction over their claims against Iran.

## II.   Personal Jurisdiction

The Rezaians must also establish that this Court has personal jurisdiction over Iran. "Under the FSIA, personal jurisdiction exists if the defendants have been properly served pursuant to [28 U.S.C. §] 1608." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 113 (D.D.C. 2015). Section 1608 provides, in turn, that service may be made by "special arrangement," "in accordance with an applicable international convention on service of judicial documents," "by any form of mail requiring a signed receipt," or by diplomatic channels. 28 U.S.C. § 1608(a). These four options are listed "'in descending order of preference'—and a plaintiff 'must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on.'"

*Angellino v. Royal Family Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012) (quoting *Ben–Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)).

Here, the first three service options listed in section 1608 were unavailable. The Rezaians have no "special relationship" with Iran that would permit service of legal documents. "Iran is not party to an 'international convention on service of judicial documents.'" *Ben-Rafael*, 540 F. Supp. 2d at 52 (quoting 28 U.S.C. § 1608(a)(2)). And Iran—a country that routinely rejects service of legal process by mail, *see, e.g.*, *id.*; *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 396 (D.D.C. 2015)—rejected mailings from the Rezaians' counsel during this case. *See* Mot. for Default J., Ex. G [Dkt. # 19]. The Rezaians, therefore, correctly turned to service through diplomatic channels, the fourth option for service.

The Rezaians' service through diplomatic channels was effective. The Clerk of the Court certified the mailing of the necessary documents to the United States Department of State on November 2, 2016. *See* Certificate of Clerk [Dkt. # 10]. The State Department then confirmed on March 1, 2017, that the documents had been delivered, by the Foreign Interests Section of the Embassy of Switzerland in Tehran, to the Iranian Ministry of Foreign Affairs. *See* Return of Service Aff. [Dkt. # 13]. This constitutes effective service under 28 U.S.C. § 1608(a)(4). *See* Roth, 78 F. Supp. 3d at 396–97. Accordingly, Iran was duly served, and this Court has personal jurisdiction of Iran in this case.

## III.    Iran's Liability

"Although Section 1605A(c) provides a private right of action, it provides no

18

guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages. Consequently, courts have applied 'general principles of tort law,' such as the RESTATEMENT (SECOND) OF TORTS, to determine liability." *Braun*, 228 F. Supp. 3d at 78 (collecting cases). The Rezaians offer four tort-law-based theories in support of their asserted damages here.

First, the Rezaians argue that Iran assaulted Jason. They are correct. "Iran is liable for assault . . . if . . . (1) it acted 'intending to cause a harmful contact with . . ., or an imminent apprehension of such a contact' by, [Jason] and (2) [Jason was] 'thereby put in such imminent apprehension.'" *Valore*, 700 F. Supp. 2d at 76 (quoting RESTATEMENT (SECOND) OF TORTS § 21(1)). Jason testified that, while being tortured, he was repeatedly and credibly threatened with death and dismemberment—and that he believed his captors might follow through on their threats. That is sufficient to establish that Iran's acts of torture constituted assault.

Second, the Rezaians contend that Iran is liable to Jason for battery. Battery requires proof that Iran "acted 'intending to cause a harmful or offensive contact with . . ., or an imminent apprehension of such a contact' by, [Jason] and (2) 'a harmful contact with' [Jason] 'directly or indirectly result[ed].'" *Valore*, 700 F. Supp. 2d at 77 (quoting RESTATEMENT (SECOND) OF TORTS § 13). Hostage taking and torture "are, by their very nature, intended to harm and to terrify by instilling fear of such harm." *Id.* And Jason's Iranian captors forcibly arrested him and repeatedly moved him around Evin Prison. Those harmful contacts were acts of battery.

Third, the Rezaians claim that Iran falsely imprisoned Jason. Again, they are correct. False imprisonment occurs when a defendant "acts intending to confine [a person] within boundaries fixed by the actor," the action "directly or indirectly results in such a confinement of the other," and the plaintiff "is conscious of the confinement or is harmed by it." *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 34 (D.D.C. 2001) (quoting RESTATEMENT (SECOND) OF TORTS § 35). Holding an innocent person hostage satisfies all of these elements. *See id.*

Finally, the Rezaians argue that all three of them—Jason, Ali, and Mary—were subjected to intentional infliction of emotional distress. Iran is "liable for intentional infliction of emotional distress if [it], 'by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress to'" each of them. *Braun*, 228 F. Supp. 3d at 81 (quoting RESTATEMENT (SECOND) OF TORTS § 46(1)). Ali and Mary, who were not "the direct recipient of the 'extreme and outrageous conduct,'" can "recover[] if (1) they are members of a victim's immediate family"—which they are—and if "(2) they are present at the time, or 'the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present.'" *Id.* (quoting *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26–27 (D.D.C. 2009)). Jason, Ali, and Mary all testified about the severe emotional distress that they experienced due to Jason's arrest and detention in Iran. There is no question that Iran detained and tortured Jason intentionally. And both hostage taking and torture have been deemed sufficiently outrageous to inflict severe emotional harm on family members who were not present. *See*

*Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 49–50 (D.D.C. 2001).  Iran is, therefore, liable to all three of the Rezaians for intentional infliction of emotional distress.

## IV.    Damages

Section 1605A of the FSIA provides for "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c)(4).  The Rezaians seek damages falling into three of those categories: They request damages for the pain and suffering caused by Iran; damages for economic losses incurred as a result of Jason's unlawful detention; and punitive damages to punish Iran and deter future illegal conduct.  They are entitled to all three.

### A.    Pain and Suffering

"To obtain compensatory damages in a FSIA case, a plaintiff 'must prove that the consequences of the defendants' acts were reasonably certain to occur, and they must prove the amount of damages by a reasonable estimate.'"  *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017) (quoting *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213 (D.D.C. 2012)).  "Pain and suffering, past and future, are obviously . . . reasonably certain consequence[s] of torture."  *Id.*  And they are likewise reasonably certain to follow from hostage taking.  *See Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 345 (D.D.C. 2016).  So the Rezaians are entitled to compensatory damages for the pain and suffering that was caused by Iran's conduct.

Courts "in this district . . . typically set damages for prolonged and abusive captivity

21

at $10,000 per day for the pain and suffering that victims experienced while imprisoned."[4] *Hekmati*, 278 F. Supp. 3d at 163–64 (quotation marks and citation omitted). "[T]his approach" also "obtained tacit approval from Congress when it enacted the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 2002, 114 Stat. 1464 (2000), which resulted in the payment of certain terrorist victims at the rate of approximately $10,000 per day of captivity." *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 156 (D.D.C. 2010). This case presents no reason to deviate from the accepted approach to calculating pain and suffering damages for being held hostage. Jason was held in captivity by Iran for 544 days. He is entitled to $10,000 for each of those days—$5,440,000 in total—to compensate him for the pain and suffering caused by the detention.

Jason also seeks damages for the pain and suffering he continues to experience after his release. Pointing to reasoning in *Massie v. Government of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 77 (D.D.C. 2008), Jason seeks $21,760,000 as compensation for the ongoing harm. That total amounts to four times the $5,440,000 damages award for his time in prison.

To be sure, Jason has ongoing medical and psychological issues caused by Iran torturing him and holding him hostage. But *Massie* does not stand for the proposition that,

---

[4] *See, e.g.*, *Stansell*, 217 F. Supp. 3d at 346; *Moradi*, 77 F. Supp. 3d at 70; *Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 77 (D.D.C. 2008); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134 (D.D.C. 2005); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 51 (D.D.C. 2001).

after calculating damages for time spent in captivity, courts should, in all cases, quadruple the award to quantify post-captivity pain and suffering. Courts must consider "the victim's age at the time of release (the length of time he will be experiencing pain and suffering) and the extent of the victim's long-term injuries" when estimating post-release damages. *Hekmati*, 278 F. Supp. 3d at 164. Those factors differ from case to case. The plaintiffs in *Massie* were taken hostage and 20-year-olds and provided evidence of significant mental and physical harm suffered over the course of 39 years. *See Massie*, 592 F. Supp. 2d at 69–72, 77.

*Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145 (D.D.C. 2017), provides a more analogous case to Jason's. There, the plaintiff was arrested by Iranian authorities, then held in Evin Prison—at times, in solitary confinement—for 1,602 days. *See id.* at 150–55, 164. He was 32 years old when released, and he experienced ongoing psychological difficulties due to the imprisonment. *See id.* at 155, 164. After reviewing damages awards from a number of FSIA cases in this district—including *Massie*—the *Hekmati* Court held that the plaintiff was entitled to a lump sum of "$10 million for his post-release pain and suffering." *Id.* at 164. Jason was likewise held hostage and tortured in Evin Prison. He was close to 40 years old when released, a bit older than the *Hekmati* plaintiff, and he spent less time in prison. But the long-term psychological effects of his detention are similar to those at issue in *Hekmati*, and Jason suffers from a number of physical afflictions caused by his detention in Iran, as well. On balance, then, Jason's situation closely parallels the facts in *Hekmati*. He is, therefore, entitled to the same $10

23

million award to compensate him for post-release pain and suffering.

Ali and Mary also experienced emotional distress during Jason's detention.  And as with FSIA plaintiffs who were directly harmed by torture and hostage taking, this district has developed a standard damages award for the pain and suffering experienced by family members of the victims of such crimes.  *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213–14 (D.D.C. 2012).  Under the standard framework, Mary, a parent of a victim, is entitled to $2.5 million.  *See id.*  Ali, a sibling, is entitled to $1.25 million.  *See id.*

These baseline awards can be enhanced "in cases with aggravating circumstances."  *Valore*, 700 F. Supp. 2d at 85–86 (quotation marks and citations omitted).  The Rezaians request a 50% upward departure from the baseline here.  They are correct that an aggravating circumstance is present:  While holding Jason hostage, Iran surveilled Ali and interrogated Mary about her efforts to free him.  This conduct goes well beyond a typical case of hostage taking and, understandably, increased Ali's and Mary's emotional distress and paranoia.  But "departures [from the baseline damages award] are usually relatively small."  *Id.* at 86.  In *Valore v. Islamic Republic of Iran*, for example, the Court capped an upward enhancement at 25% for a victim's family member who "suffered several nervous breakdowns, at least one of which required hospitalization," and "from which she has never fully recovered."  *Id.*  This Court does not see a reason for a greater departure from the baseline here.  Mary's and Ali's damages for pain and suffering will each, therefore, be enhanced by 25%, making their awards $3,125,000 and $1,562,500, respectively.

### B. Economic Damages

The Rezaians also seek damages for lost earnings.[5] "As a general rule, lost earnings—past and future—are compensable economic damages" in FSIA cases. *Moradi*, 77 F. Supp. 3d at 71 (citing RESTATEMENT (SECOND) OF TORTS § 906). As with pain and suffering damages, economic damages must be proven "by a reasonable estimate." *Id.* (quoting *Reed*, 845 F. Supp. 2d at 213). But "[u]nlike . . . pain and suffering, lost earnings are not hard to quantify," and plaintiffs must do so "with competent evidence." *Id.* Establishing a reasonable estimate of lost earnings through persuasive expert analysis supported by sound factual bases has been deemed sufficient. *See, e.g.*, *Hekmati*, 278 F. Supp. 3d at 165. And here, the Rezaians testified about their lost earnings and submitted an expert report from Benjamin A. Sacks ("Sacks"), an economist with the Brattle Group. This evidence established that the Rezaians suffered economic losses caused by Iran.

Jason, for his part, never lost his primary income, the salary he drew from the Washington *Post*. To its credit, the *Post* continued paying Jason's salary during his detention, and Jason still reports for the newspaper. But he has, nonetheless, presented evidence of certain lost earnings caused by Iran's conduct.

First, while living in Tehran, Jason performed consulting work on top of his day job with the *Post*. Jason consulted for CBS's *60 Minutes*, appeared on CNN's *Parts Unknown*, and was in talks to work with other television programs on a long-term basis. Jason cannot

---

[5] After the hearing in this matter, the Rezaians wisely decided to limit their request for economic damages to compensation for lost earnings. *See* Pls.' Suppl. Brief on Damages ("Suppl. Br.") at 12–13 [Dkt. # 34].

pursue the same sort of consulting work he was doing in Iran—assisting American television programs shooting content inside Iran—now that he is prohibited from living in the country. So the likely earnings from Jason's budding consulting career are compensable economic damages. Based on Jason's testimony, Sacks estimates that Jason would have earned $75,000 a year in consulting fees had he been able to continue working from Iran. *See* Expert Report of Benjamin A. Sacks ("Sacks Report") ¶ 11 [Dkt. # 19-1].

Second, even though Jason continues to earn his salary from the Washington *Post*, that salary was more valuable in Tehran, with its low cost of living, than it is in the District of Columbia, Jason's current hometown. Jason requests that Iran be held liable for the wealth he loses each year due to the District's higher cost of living, and caselaw supports granting his request. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 79 (D.D.C. 2011) (incorporating "appropriate cost of living adjustments" into an award of economic damages). Holding Iran liable for wealth Jason is losing because of Iran's conduct is consistent, moreover, with general tort principles: "compensatory damages [should] place [a plaintiff] in a position substantially equivalent in a pecuniary way to that which he would have occupied had no tort been committed."[6] RESTATEMENT (SECOND) OF TORTS § 903, cmt. a. Accordingly, Sacks properly incorporated a cost of living adjustment into his lost earnings calculation for Jason.

Incorporating both the consulting income and a cost of living adjustment, and

---

[6] "[A] district court may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018).

assuming a retirement age of 65, Sacks calculates Jason's lost earnings as $8,231,603. *See* Suppl. Br. at 21; Sacks Report ¶¶ 8–27, 32–34.

Jason's lost earnings must, however, be discounted by the earnings from a book he wrote about his experience in Iran. There is, of course, no sense in which a book deal is a fair trade for being tortured and held hostage. But "the law of torts attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort." RESTATEMENT (SECOND) OF TORTS § 901, cmt. a. Jason could not have won a contract to write about his detention in Iran had that detention never happened. His $350,000 book deal must, therefore, be accounted for when calculating his lost earnings.

Sacks recognizes this. *See* Sacks Report ¶¶ 32–34. But in his report, Sacks discounts Jason's lost earnings by only $175,000, on the theory that, prior to his detention, Jason was planning to write a book and had discussed the possibility with publishing agents. *See id.* Attributing a specific dollar amount to a book deal that never progressed past "discussions" is far too speculative to pass muster in a lost earnings calculation. *See Moradi*, 77 F. Supp. 3d at 71 (holding that "lost earnings are not hard to quantify" and must be supported by "competent evidence"). Jason's economic damages award must be discounted by the full $350,000 earned from his post-detention book deal, which brings the award to $8,056,603.

Ali and Mary also suffered economic damages. Ali neglected his consulting business and incurred travel expenses to advocate for Jason's release. He provided evidence substantiating $1,103,508 in expenses and lost income. Mary resigned her job as

a teacher in Istanbul to help Jason's cause from inside Iran. By spending her time in Iran, rather than working, she lost $8,500 in income. Iran is liable for both of these losses.

With prejudgment interest applied,[7] Jason's lost earnings award is $8,407,267. Ali's award is $1,149,539. And Mary's is $8,761.

## C.    Punitive Damages

The final category of damages at issue is punitive damages. Punitive damages "are awarded not to compensate the victims, but to 'punish outrageous behavior and deter such outrageous conduct in the future.'" *Braun*, 228 F. Supp. 3d at 86 (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)). Courts have repeatedly held, in section 1605A cases, that Iran's actions were outrageous, and imposed substantial punitive damages awards as a result. *See, e.g.*, *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 17 (D.D.C. 2012); *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 57 (D.D.C. 2012); *Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 45 (D.D.C. 2012); *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011). Iran's conduct in this case again satisfies the relevant standard. Holding a man hostage and torturing him to gain leverage in negotiations with the United States is outrageous, deserving of punishment, and surely in need of deterrence.

To calculate punitive damages awards in section 1605A cases, "courts consider

---

[7] "Whether to award prejudgment interest is a matter committed to the discretion of the court, subject to equitable considerations . . . ." *Roth v. Syrian Arab Republic*, No. 1:14-1946, 2018 WL 4680270, at *16 (D.D.C. Sept. 28, 2018). Here, Sacks "appl[ied] prejudgment interest, based on when expenses or losses were incurred, through May 31, 2017," the date of his report, "at the 3-year U.S. Treasury rate of 1.44%." Sacks Report ¶ 36. I have concluded that this was appropriate.

(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Braun*, 228 F. Supp. 3d at 86 (quotation marks omitted). Employment of these factors has yielded several different methods of determining the ultimate award. "One approach is to multiply the foreign state's 'annual expenditures on terrorism' by a factor between three and five." *Id.* at 87. This calculation method, which has "result[ed] in awards in the billions of dollars," is most commonly used in "case[s] of exceptionally deadly attacks, such as the 1983 bombing of the Marine barracks in Beirut, which killed 241 American military servicemen." *Id.* "Another approach awards a fixed amount of $150,000,000 per affected family." *Id.* A third "award[s] punitive damages in an amount equal to the total compensatory damages." *Moradi*, 77 F. Supp. 3d at 73.

The Rezaians ask for a punitive damages award of "at least $1 billion," based in large part on Iran's estimated expenditures on terrorism. Suppl. Br. at 22–27. But it is difficult to describe Iran's detention of Jason, however abhorrent, as "exceptionally deadly." *Braun*, 228 F. Supp. 3d at 87. In many ways, Iran's conduct here resembles the conduct at issue in *Moradi v. Islamic Republic of Iran*, where the plaintiff was arrested, held in solitary confinement, and tortured into falsely confessing to crimes by Iranian authorities. *See* 77 F. Supp. 3d at 60–64. In *Moradi*, the Court determined that punitive damages should equal the amount of compensatory damages that were awarded.[8] *See id.*

---

[8] The same method was used to determine punitive damages in *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 167 (D.D.C. 2017), which, as discussed, is also factually similar to this case, *see supra* p. 23.

at 73. Here, though, Iran's conduct does present an additional exacerbating factor, not present in *Moradi*, that must be accounted for: The Rezaians presented evidence showing that Iran arrested and detained Jason to increase its bargaining leverage in ongoing negotiations with the United States. "[T]he need for deter[ing]," *Braun*, 228 F. Supp. 3d at 86, such conduct is critical, and so the punitive damages assessed here should be higher than in *Moradi*. The Court concludes that the "$150,000,000 per affected family," *id.* at 87, measure is most appropriate and, therefore, awards $150,000,000 in punitive damages jointly to the Rezaians.

## CONCLUSION

For the foregoing reasons, the Rezaians' Motion for Default Judgment [Dkt. # 19] and Motion in Limine [Dkt. # 28] are GRANTED. The Clerk of the Court is directed to enter judgment against Iran in the following amounts: Jason Rezaian is awarded $15,440,000 in damages for pain and suffering and $8,407,267 in economic damages. Ali Rezaian is awarded $1,562,500 in damages for pain and suffering and $1,149,539 in economic damages. Mary Rezaian is awarded $3,125,000 in damages for pain and suffering and $8,761 in economic damages. And the Rezaians are jointly awarded $150,000,000 in punitive damages. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge